774 F.2d 1193
 249 U.S.App.D.C. 224
 ATLANTIC RICHFIELD COMPANY, Appellant, Maryland Tankers, Inc.
v.
UNITED STATES of America, et al.
ATLANTIC RICHFIELD COMPANY Maryland Tankers, Inc., Appellant,
v.
UNITED STATES of America, et al.
 Nos. 84-5752, 84-5885.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 6, 1985.
Decided Oct. 11, 1985.
 
 Appeals from the United States District Court for the District of columbia.
 Michael Joseph, Washington, D.C., with whom Mark P. Schlefer, Thomas L. Mills and Donald M. Squires, Washington, D.C., were on brief, for appellant Atlantic Richfield Co. in No. 84-5752.
 Jonathan Blank, John W. Angus, III, William E. McDaniels, Kevin T. Baine and Eleni M. Constantine, Washington, D.C., were on brief, for appellant Maryland Tankers, Inc. in No. 84-5885.
 John H.E. Bayly, Jr., Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee U.S. in Nos. 84-5752 and 84-5885.
 Allan Abbot Tuttle, Washington, D.C., with whom Jeff Turner and Joseph A. Klausner, Washington, D.C., were on brief, for appellees OMI Corp. et al. in Nos. 84-5752 and 84-5885.
 Before WALD, EDWARDS and STARR, Circuit Judges.
 Opinion for the Court filed by Circuit Judge EDWARDS.
 HARRY T. EDWARDS, Circuit Judge:
 
 
 1
 Under section 506 of the Merchant Marine Act of 1936 ("the Act"),[1] United States-flag ships built with the aid of federal construction subsidies generally are prohibited from entering the domestic shipping trade. However, on occasions, this prohibition is lifted if the Maritime Administration ("MarAd")
 
 
 2
 consent[s] in writing to the temporary transfer of such [subsidized] vessel to [domestic service] ... for periods not exceeding six months in any year, whenever [MarAd] may determine that such transfer is necessary or appropriate to carry out the purposes of this Act.[2]
 
 
 3
 Pursuant to this exception, the appellants, Atlantic Richfield Company ("ARCO") and Maryland Tankers, Inc. ("Maryland Tanker"), each received approval from MarAd to enter the Alaskan-Panama Canal domestic oil trade on the condition that four unsubsidized United States-flag ships remain "fixed for suitable employment." At issue in this case is whether the appellants were entitled to an opportunity to contest the termination of their domestic trade approvals when MarAd determined that two unsubsidized ships were no longer "fixed for suitable employment."
 
 
 4
 The District Court found that the subsidized shippers had no rights to assert under either the Merchant Marine Act, the Administrative Procedure Act ("APA") or the due process clause of the Fifth Amendment. Although we do not subscribe to all of the reasoning of the District Court, we do agree that the judgment of MarAd must be upheld. We find that MarAd properly concluded that, during the disputed period here in question, the unsubsidized ships were without employment in the trade, and therefore these ships were no longer "fixed for suitable employment." We also hold that MarAd was not required to assess whether the unsubsidized ships were reasonably unemployed before confirming the terminations of the conditional licenses of the subsidized shippers. Accordingly, we affirm.
 
 I. BACKGROUND
 
 5
 The Merchant Marine Act of 1936[3] divides the United States fleet into two classes of vessels: unsubsidized United States-flag ships with the exclusive right to transport merchandise between points in the United States[4] and subsidized United States-flag ships limited to foreign shipping.[5] Because the costs of building and operating United States-flag ships traditionally have been considerably higher than comparable costs in foreign countries, Congress enacted several statutes for the purpose of protecting the United States shipping industry. With respect to the domestic trade, the Merchant Marine Act of 1920 requires that vessels transporting merchandise in the domestic trade be built in the United States and owned by United States citizens.[6]
 
 
 6
 To make United States vessels competitive in foreign shipping, the Merchant Marine Act of 1936 authorizes MarAd to pay a construction-differential subsidy ("CDS") of up to fifty percent of the cost of a vessel built in the United States.[7] This subsidy is aimed at equalizing ship construction costs in the United States and foreign countries. However, while offering a possible cure for the problem of foreign competition, the subsidy program also threatened to promote an imbalance among United States shippers in the domestic trade. Consequently, Congress sought to provide the unsubsidized fleet with protection from the competition of CDS-subsidized ships by generally prohibiting CDS-subsidized ships from entering the domestic shipping trade. But, recognizing the possibility that domestic ships may not always be adequate for the demand, the Act also provides MarAd may
 
 
 7
 consent in writing to the temporary transfer of such [subsidized] vessel to [domestic service] ... for periods not exceeding six months in any year, whenever [MarAd] may determine that such transfer is necessary or appropriate to carry out the purposes of this Act.[8]
 
 
 8
 Under regulations promulgated by MarAd,[9] operators of subsidized ships who wish to enter the Alaskan-Panama Canal domestic oil trade must provide MarAd with all available information to support the applicant's assertion that "suitable vessel[s]"[10] of a "competitor"[11] would not be available to carry the cargo. After reviewing written protests from competitors and responses to the protests from the applicant, MarAd decides whether the applicant's entry into the trade is necessary or appropriate to carry out the purposes of the Act. MarAd generally denies an application if any unsubsidized "suitable vessels" are available to transport the cargo.[12]
 
 
 9
 ARCO, Maryland Tanker and Acturus Shipping, Inc. each operate CDS-built very large crude-oil carriers ("VLCC"). On August 30, 1983, ARCO requested permission to enter the Alaskan-Panama Canal oil trade for six months beginning in late October or early November. Two weeks later, on September 14, 1983, Maryland Tanker and Acturus Shipping made similar requests. The operators of several unsubsidized vessels protested these applications. The unsubsidized shippers advised MarAd that they had not yet made arrangements for employment of their vessels following the expiration of their current charters. On October 7, 1983, MarAd granted the requests of the subsidized shippers to enter the trade for six months. These approvals, however, were subject to the condition that they would terminate if any one of four unsubsidized ships were not "fixed for suitable employment" when their charters expired.[13]
 
 
 10
 The three VLCCs began carrying Alaskan oil in November, 1983, but on January 10, 1984, each VLCC received a telegram from MarAd stating that the domestic trading approvals were "terminated, effective immediately" because two of the four unsubsidized vessels named in the condition to the approval--the PRINCE WILLIAM SOUND and the OGDEN COLUMBIA--"remain[ed] unemployed." ARCO filed a petition to reopen, requesting an opportunity to present facts to MarAd that would show that the PRINCE WILLIAM SOUND and OGDEN COLUMBIA had voluntarily foregone opportunities for suitable employment. According to ARCO, the two vessels were unemployed because the owners had demanded unreasonably high rates for their vessels. MarAd denied ARCO's petition, stating that the January 10th telegram was not an order, but merely gratuitous advice to ARCO that the domestic trading approvals had expired on their own terms.
 
 
 11
 ARCO then commenced this action in the District Court seeking an injunction staying the effectiveness of the termination and a declaratory judgment that the termination was unlawful. The District Court granted the motion of OMI Corporation and Alaska Bulk Carriers, Inc. ("Intervenors") to intervene as defendants and the motion of Maryland Tanker to intervene as plaintiff. Upon cross-motions for summary judgment, the District Court concluded that the approvals held by ARCO and Maryland Tanker were temporary licenses not protected by section 9(b) of the APA[14] and that neither appellant had a property interest in the approvals. The court further held that MarAd was neither arbitrary nor capricious in imposing the condition on the approvals granted ARCO and Maryland Tanker. For these reasons, the trial court granted summary judgment in favor of the Government. This appeal followed.
 
 II. ANALYSIS
 A. Mootness
 
 12
 We pause briefly at the threshold to address the contention of the Government and intervenors that this case is moot. For three reasons--each of them infirm, in our view--the Government and intervenors argue that this case no longer presents a live controversy. First, it is asserted that, as a result of a new rule permitting subsidized ships to enter the domestic trade on a permanent basis, ARCO no longer operates vessels in the subsidized fleet and, therefore, at least in the foreseeable future, ARCO will have no need to apply for temporary approval to enter the domestic trade. On May 7, 1985, MarAd published a final rule providing that subsidized vessels would be permitted to enter the domestic trade permanently by repaying their unamortized CDS along with compounded interest.[15] On July 26, 1985, ARCO repaid its unamortized CDS (with compounded interest) and MarAd permitted ARCO's vessels to enter the domestic trade on a permanent basis. Maryland Tanker made a similar application to repay its CDS on July 18, 1985, but has not yet made repayment.[16] The Government argues that the effect of ARCO's repayment is to eliminate the possibility that ARCO will ever again hold a conditional approval. Additionally, the Government argues that the new rule will increase the size of the domestic fleet, making future issuance of temporary approvals to enter the domestic trade very unlikely.
 
 
 13
 We do not find this recent change in circumstance sufficient to remove all legal controversy. Although ARCO's present vessels are no longer in the CDS fleet--and hence will not be subject to conditional approvals in the future--Maryland Tanker is still barred from the domestic trade in the absence of a temporary approval from MarAd. Furthermore, the operators of several unsubsidized vessels have challenged the new rule that permitted ARCO to enter the domestic trade on a permanent basis, and four consolidated civil actions are now pending in the District Court.[17] If the rule is held invalid, the parties do not dispute that ARCO will continue its practice of applying to MarAd for permission to enter the domestic trade. Even if the rule is ultimately upheld, there is no evidence to indicate that MarAd will cease granting temporary approvals to subsidized shippers to enter the Alaskan-Panama Canal domestic oil trade.[18] Thus, although the regulation "may reduce the practical importance of this case, it does not completely remove the controversy."[19]
 
 
 14
 Second, the intervenors allege that MarAd has changed its administrative practice and will now grant unconditional approvals for less than six months rather than the six-month conditional approvals at issue in this case.[20] However, even if it is true that no conditional approvals have been granted in the recent past, MarAd remains free to issue conditional approvals in the future absent a declaratory judgment that the practice is unlawful. Therefore, whether or not MarAd has instituted a change in policy, it is well-established that an agency's voluntary cessation of allegedly illegal conduct does not moot a case.[21]
 
 
 15
 The Government's third argument is that this court is no longer able to enjoin the termination of the approvals granted to ARCO and Maryland Tanker because the approvals were limited to a six-month period that elapsed long before the case reached this court. We conclude, however, that this case is not moot on this ground because it is plainly "capable of repetition, yet evading review."[22] There are two requirements for the application of this exception to the mootness doctrine:(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.[23]
 
 
 16
 The first requirement is obviously fulfilled in this case. The six-month permit period expired long before the District Court could rule on cross motions for summary judgment. The Government argues, however, that there is no reasonable expectation that ARCO or Maryland Tanker will again be subject to the condition. The circumstances of the industry, however, suggest that Maryland Tanker--and ARCO, if the challenge to the permanent entry rule is successful--will seek approvals to enter the domestic trade in the future. The foreign oil trading market is severely depressed and employment for Maryland Tanker's vessel is available only in the domestic oil trade.[24] Maryland Tanker will certainly apply for approval to enter the only trade available for its vessel. If such a future application is approved, it very likely will be conditioned on the suitable employment of unsubsidized ships. The problem of ensuring the employment of all unsubsidized ships throughout the entire six-month approval period is not unique to this case. Over the last several years, MarAd has issued several conditional approvals and at least one short-term approval to avoid the displacement of unsubsidized vessels.[25]
 
 
 17
 We conclude that there is a reasonable expectation that Maryland Tanker will be subject in the future to a conditional license. The likelihood of such a conditional license is comparable to that found in other cases in which we have applied the capable of repetition, yet evading review doctrine.[26] We therefore hold that this case is not moot and move on to the merits.
 
 B. The Administrative Procedure Act
 
 18
 The central issue in this case is whether ARCO and Maryland Tanker were entitled to an opportunity to contest the termination of their approvals. ARCO and Maryland Tanker argue that they were entitled to such an opportunity under section 9(b) of the APA, which provides that an agency must give a licensee an opportunity to demonstrate or achieve compliance with all lawful requirements before the agency withdraws, suspends, revokes, or annuls a license.[27] According to ARCO and Maryland Tanker, section 9(b) required MarAd to give them an opportunity to demonstrate that the two unsubsidized ships had refused reasonable offers of employment and therefore had voluntarily foregone suitable employment.
 
 
 19
 We agree that the approvals held by ARCO and Maryland Tanker were protected by the requirements of section 9(b). Although short-term and restricted, the MarAd approvals clearly fell within the broad definition of license provided in the APA;[28] therefore, there can be no serious doubt regarding the applicability of section 9(b). The District Court held, and the Government and intervenors now argue, that these domestic trading approvals are "temporary licenses" to which section 9(b) of the APA should not apply. The District Court seemingly held the view that a short-term or restricted license is somehow excluded from the sweep of section 9(b). The simple answer to this contention is that it has no basis in law. The APA defines a "license" to include "any agency permit ... approval ... or other form of permission;" and, there is no minimum time-period requirement provided in the APA for licenses to be protected by section 9(b).
 
 
 20
 All licenses are limited in time and we see no policy or statutory rationale supporting the District Court's position concerning the reach of section 9(b). Although this court in Great Lakes Airline, Inc. v. CAB,[29] held that section 9(b) did not apply to a so-called "temporary license" granted to an airline by the CAB, we used the term "temporary license" to mean a permit issued temporarily pending the final determination of an application for a permanent license.[30] The court noted that, in such a case, the holder of the temporary license would have an opportunity to contest disapproval in the hearings held to consider the application for a permanent license. In the present case, no such final determination was pending and, consequently, the MarAd approvals could not be seen as "temporary licenses."
 
 
 21
 In our view, the more important issue in this case is whether the licenses held by ARCO and Maryland Tanker were withdrawn, suspended, revoked or annulled so as to trigger the procedural requirements of section 9(b). A license that expires on its own terms is not protected by section 9(b).[31] Thus, a licensee whose license has expired because of the passage of time, for example, is not entitled to a hearing under section 9(b).[32] Congress enacted section 9(b) to afford licensees "an opportunity to comply with the requirements" of a license before termination.[33] For the procedural requirements of section 9(b) to apply, therefore, the licensee must be able to establish compliance with all legal requirements or must be able to change its conduct in a manner that will "put its house in lawful order."[34] Neither purpose is served when a license terminates on its own terms as a result of the occurrence of an objective condition that is beyond the control of the licensee.
 
 
 22
 We must, therefore, closely examine the "suitable employment" condition to see if an objective condition arose resulting in the termination of the license on its own terms. We recognize that "suitable employment" is susceptible to myriad possible interpretations. ARCO and Maryland Tanker, for example, argue that "suitable employment" simply requires an opportunity for a reasonable profit. Under this definition, appellants contend that their licenses could only be terminated following a determination by MarAd that the unsubsidized shippers had not refused reasonable offers of employment. Although superficially appealing, we must reject this definition as wholly untenable under the Act and inconsistent with the basic terms of the licenses that were granted to the appellants.
 
 
 23
 The most detailed explanation of the "suitable employment" condition is found in Application of ARCO Transportation Co.,[35] the first MarAd order to impose the condition. In that application, MarAd was concerned that two unsubsidized vessels would become "available" for trade before the expiration of any six-month approval. If a six-month unconditional approval were granted, the unsubsidized vessels would "possibly be shut out of the trade." An obvious solution was to grant an approval for less than six months, but there was "just as great a chance" that the unsubsidized vessels would remain employed and that the subsidized vessels would be needed in the Alaskan trade for the full six months. If that were the case, MarAd noted, the approval process--with applications, protests and responses--would have to be reinstated once again. In order to spare all parties the necessity of new proceedings that would be pointless if unsubsidized vessels obtained employment in the meantime, MarAd approved the applications for a six-month period contingent on the unsubsidized vessels "being fixed prior to" the expiration of their charters.
 
 
 24
 Although "suitable employment" may be an unfortunate choice of words to state the meaning of a conditional approval, it is clear from the discussion in ARCO Transportation that MarAd intended this term to mean simply employment in trade. If an unsubsidized ship were without employment--for whatever reason--and were available to transport the cargo, MarAd intended the approvals to terminate automatically. MarAd never suggested any concern with the prices charged by unsubsidized vessels. Instead, MarAd's sole concern was that the unsubsidized ships be fixed for employment after the expiration of the old charters. In short, the condition was employed to avoid an unnecessary second approval proceeding; it was a simple matter of administrative convenience whereby MarAd imposed a six-month conditional approval rather than a two-month unconditional approval. If MarAd had proposed to determine whether unsubsidized shippers had refused reasonable offers of employment, the whole point of administrative convenience would have been lost because MarAd would necessarily have become enmeshed in ratemaking for the industry. Such a ratemaking responsibility is neither easy nor routine. It seems rather obvious that it would have been the height of irrationality for MarAd to take on such a difficult and time-consuming ratemaking task when its purpose in adopting a conditional approval was administrative convenience.[36]
 
 
 25
 We also think it unlikely that MarAd would adopt a condition that required an evaluation of the rates offered by unsubsidized vessels without some discussion of its authority to regulate the rates in the domestic oil trade. MarAd has never considered the reasonableness of rates charged by unsubsidized vessels in its proceedings to review applications for approval to enter the domestic trade.[37] Therefore, the examination of these rates would have constituted an extraordinary change in administrative practice. Furthermore, Congress has been rather explicit in establishing a "reasonable rate" requirement in other shipping statutes;[38] therefore, we cannot imagine that MarAd simply would have assumed ratemaking authority, where none is given by statute, with no explanation of its position.
 
 
 26
 For all of the foregoing reasons, we conclude that the "suitable employment" condition established a simple and objective requirement--that the unsubsidized ships be employed in trade. No one disputes that the two unsubsidized vessels were not employed in trade at the time when MarAd confirmed the expiration of appellants' licenses. Consequently, the licenses were not withdrawn, suspended, revoked or annulled, but rather terminated on their own terms. We hold, therefore, that neither appellant was entitled to a hearing under section 9(b).
 
 
 27
 The result in this case is entirely fair to all parties concerned. Operators of subsidized ships holding conditional licenses can apply for new approvals if their licenses terminate because of the unemployment of unsubsidized ships. During the new application process, these operators will have the opportunity to present evidence that the unsubsidized vessels are suitably employed. This would give MarAd the opportunity--if it has the authority and properly chooses--to evaluate the reasonableness of rates rejected by unsubsidized ships at this new application proceeding without the pressure of an artificial deadline.
 
 C. Due Process
 
 28
 ARCO and Maryland Tanker additionally argue that they were entitled to notice and hearing before the termination of their licenses under the due process clause of the Fifth Amendment.[39] We hold that the appellants were not deprived of their property interests in the approvals without due process. There is no dispute that two unsubsidized ships were unemployed. By the very terms of the condition, this unemployment automatically terminated the approvals. In the absence of a factual dispute over the unemployment in trade of the ships, the due process clause does not require an opportunity to be heard.[40] Once two unsubsidized ships remained without employment in trade--a fact that the appellants do not deny--no evidence appellants could have presented to MarAd could change the fact that their approvals had terminated on their own terms.[41]
 
 D. Validity of the Condition
 
 29
 Finally, we must address the validity of the condition MarAd imposed on the approvals. Although ARCO and Maryland Tanker do not contest MarAd's authority under the statute to issue conditional approvals, they do assert that this particular condition is arbitrary, capricious, and an abuse of discretion. In advancing this argument, appellants point to a portion of MarAd's order that seemingly attacks the very condition it adopts:
 
 
 30
 The effect of a conditional waiver is detrimental to the shipping industry by making MARAD the ultimate charter broker. MARAD's insistence on the employment of all suitable Jones Act vessels during the entire waiver period creates an artificial charter rate structure for such vessels and effectively permits the owners and operators of such ships to block the utilization of more efficient tonnage in the domestic trade. The Government's intrusion into the charter market fails to promote either efficiency or economy. Moreover, the uncertainty caused by a waiver system dependent upon future charters of Jones Act vessels will bar the entry of VLCC tonnage on a temporary basis. Activation of such vessels from lay-up cannot be economically undertaken without the realistic anticipation of a full six months of employment.[42]
 
 
 31
 Upon closer examination of the order, however, it is evident that this paragraph was not a finding by MarAd, but, rather, a reproduced verbatim view of Acturus Shipping Inc., another applicant for approval to enter the domestic trade.[43]
 
 
 32
 We conclude that the condition imposed by MarAd was a reasoned effort to fulfill the dual purposes of the Act: to protect the unsubsidized domestic fleet from displacement by the subsidized fleet, while still ensuring adequate domestic shipping capacity. The Supreme Court recently explained the purpose of the bar to easy entry by CDS vessels in the domestic trade:
 
 
 33
 It was recognized from the outset that substantial limits would have to be placed upon the entry of subsidized vessels into the domestic trade. Any other result would have been disastrous for the unsubsidized Jones Act fleet for which that trade was (and is) reserved. Burdened by higher construction costs, greater outstanding debt, and higher operating expenses that fleet would simply have been unable to compete with new vessels enjoying the benefits of the 1936 Act.[44]
 
 
 34
 The Court noted that absent substantial barriers to the ability of a subsidized vessel "to move from one market to the other, it would be a formidable force in both, capable of taking advantage of every shift in trade and profitability, skimming the cream and leaving what remains to the less mobile."[45] The Court concluded, therefore, that Congress intended entry by subsidized vessels only "under narrowly circumscribed conditions."[46] It was appropriate, therefore, for MarAd to insist on the continued employment of all available unsubsidized vessels before granting any approvals to enter the domestic trade. Only by such an insistence could MarAd ensure that the unsubsidized fleet was protected from unfair competition with the subsidized fleet. Although this could have been accomplished by an approval for a period of less than six months, it was reasonable for MarAd to adopt a conditional approval as a method of sparing all parties the prospect of an unnecessary renewal of the approval process. Once the license terminated, if ARCO or Maryland Tanker believed that the domestic shipping trade still had room for their vessels, they could have applied for new approvals to enter the trade. If all unsubsidized vessels were employed, and unmet domestic demand still existed, approvals likely would have been forthcoming.[47]
 
 III. CONCLUSION
 
 35
 For the foregoing reasons, we hold that ARCO and Maryland Tanker were not entitled to an opportunity to contest the termination of their limited licenses. Once an unsubsidized ship became unemployed, the approvals expired on their own terms, and neither the Merchant Marine Act, the APA nor the Fifth Amendment required an opportunity to be heard. The condition imposed by MarAd on the approvals was a rational method of fulfilling the purposes of the Act and was not arbitrary or capricious. Accordingly the decision of the District Court is
 
 
 36
 Affirmed.
 
 
 
 [1]
 46 U.S.C. app. Sec. 1156 (Supp. I 1983)
 
 
 [2]
 Id
 
 
 [3]
 46 U.S.C. app. Secs. 1101-1294 (Supp. I 1983)
 
 
 [4]
 46 U.S.C. app. Sec. 883 (Supp. I 1983)
 
 
 [5]
 46 U.S.C. app. Sec. 1156 (Supp. I 1983)
 
 
 [6]
 46 U.S.C. app. Sec. 883 (Supp. I 1983)
 
 
 [7]
 46 U.S.C. app. Secs. 1151, 1152(b) (Supp. I 1983)
 
 
 [8]
 46 U.S.C. app. Sec. 1156 (Supp. I 1983). This consent is conditioned upon the owner's agreement to pay MarAd "an amount which bears the same proportion to the [CDS] paid by [MarAd] as such temporary period bears to the entire economic life of the vessel." Id. The Act allows the Secretary of Transportation to grant approvals to enter the domestic trade, but the Secretary has delegated this authority to MarAd. 49 C.F.R. Secs. 1.66-1.67 (1984)
 
 
 [9]
 46 C.F.R. pt. 250 (1984)
 
 
 [10]
 A "suitable vessel" is defined as:
 [A] tank vessel that is in compliance with all applicable requirements of United States law and of at least 100,000 deadweight tons, if engaging in the carriage of Alaskan oil in the Alaska-Panama Canal trade.
 
 
 [46]
 C.F.R. Sec. 250.2(h) (1984)
 
 
 [11]
 A "competitor" is defined as:
 [A]ny owner or operator of an American-flag vessel, that has been built or is being constructed without CDS, and is eligible for operation in the domestic trade, pursuant to section 27 of the Merchant Marine Act, 1920 (46 U.S.C. 883).
 
 
 [46]
 C.F.R. Sec. 250.2(c) (1984)
 
 
 [12]
 See, e.g., Application of Boston VLCC Tankers, Inc. VI, 19 Ship.Reg.Rep. (P & F) 43 (M.A.1979) (denying application when two unsubsidized ships were available to carry cargo)
 
 
 [13]
 This condition stated in pertinent part:
 [I]f the OVERSEAS BOSTON, OVERSEAS JUNEAU and PRINCE WILLIAM SOUND are not fixed for suitable employment, and/or their protests are not withdrawn, before their charters expire the approvals will terminate, without further action.
 When the [OGDEN COLUMBIA] is delivered ... it must also be fixed for suitable employment and/or its protest withdrawn or the approvals concerning the three VLCC's will terminate without further action.
 Joint Appendix ("J.A.") at 21 (emphasis added).
 
 
 [14]
 5 U.S.C. Sec. 558(c) (1982)
 
 
 [15]
 Construction-Differential Subsidy Repayment, 50 Fed.Reg. 19,170 (1985) (to be codified at 46 C.F.R. pt. 276)
 
 
 [16]
 On September 12, 1985, MarAd informed Maryland Tanker that no decision was possible on its repayment application because its application was deficient
 
 
 [17]
 Independent United States Tanker Owners Comm. v. Dole, No. 85-1555, No. 85-1740, 85-1752, 85-1771 (D.D.C. filed May 15, 1985)
 
 
 [18]
 According to the government's own assertions, the equivalent of three VLCCs have received permission to enter the Alaskan-Panama Canal oil trade over the past three years and so far only two VLCCs have been permitted to enter the domestic trade permanently. MarAd would continue to grant temporary approvals to enter the trade in order to meet the apparent unfilled demand
 
 
 [19]
 United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968) (regulation that caused the antitrust defendant to disband does not make case moot)
 
 
 [20]
 In the most recent application by ARCO for approval to enter the domestic trade, MarAd granted an approval for less than six months rather than a conditional six-month approval. See Application of Atlantic Richfield Co., 23 Ship.Reg.Rep. (P & F) 305, 312 (M.A.1985)
 
 
 [21]
 See DeFunis v. Odegaard, 416 U.S. 312, 318, 94 S.Ct. 1704, 1706, 40 L.Ed.2d 164 (1974); United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 202-03, 89 S.Ct. 361, 363-64, 21 L.Ed.2d 344 (1968); United States v. W.T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953)
 
 
 [22]
 Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911)
 
 
 [23]
 Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975)
 
 
 [24]
 See District Court Record at 155-56 (letter from MarAd to American Trading Transportation Company noting that "the foreign trade remains depressed," and "even tankers built with subsidy cannot find employment" in the foreign trade)
 
 
 [25]
 See, e.g., Application of Atlantic Richfield Co., 23 Ship.Reg.Rep. (P & F) 305 (M.A.1985); Application of ARCO Transportation Co., 21 Ship.Reg.Rep. (P & F) 1234 (M.A.1982)
 
 
 [26]
 See Doe v. Harris, 696 F.2d 109, 112 (D.C.Cir.1982) ("[I]t is hardly apparent that the official conduct Doe assails--demand for records the VA maintains for Doe, and release of those records without notice to Doe--will not recur.") (emphasis in original); Nader v. Volpe, 475 F.2d 916, 917 (D.C.Cir.1973) (challenge to temporary exemption to a Motor Vehicle Safety Standard promulgated by the Secretary of Transportation not mooted when exemption withdrawn)
 The circumstances that led to the conditional approvals were not so unique as to make future conditional approvals as unlikely as in Tennessee Gas Pipeline Co. v. FPC, 606 F.2d 1373 (D.C.Cir.1979) (company practice was tailored to unique circumstance and therefore unlikely to recur). Furthermore, the likelihood of future conditional approvals is certainly much higher than that in Grano v. Barry, 733 F.2d 164 (D.C.Cir.1984), upon which the government so heavily relies. In Grano, the situation leading to the litigation was unique--a referendum on an initiative to prevent the destruction of an historical building--and was very unlikely to happen again.
 
 
 [27]
 Section 9(b) of the APA provides in pertinent part:
 [T]he withdrawal, suspension, revocation, or annulment of a license is lawful only if, before the institution of agency proceedings therefor, the licensee has been given--
 (1) notice by the agency in writing of the facts or conduct which may warrant the action; and
 (2) opportunity to demonstrate or achieve compliance with all lawful requirements.
 5 U.S.C. Sec. 558(c) (1982).
 
 
 [28]
 Under 5 U.S.C. Sec. 551(8), a license "includes the whole or a part of any agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission." (Emphasis supplied). As such, the MarAd approvals are clearly licenses. See Blackwell College of Business v. Attorney General, 454 F.2d 928, 932 (D.C.Cir.1972) ("approval" by Immigration and Naturalization Service constitutes a license)
 
 
 [29]
 294 F.2d 217 (D.C.Cir.), cert. denied, 366 U.S. 965, 81 S.Ct. 1920, 6 L.Ed.2d 1256 (1961)
 
 
 [30]
 In Great Lakes we relied on a letter from the Attorney General regarding the APA that stated:
 The second sentence of subsection (b) [of section 9] is not intended to apply to temporary licenses which may be issued pending the determination of applications for licenses.
 Appendix to the Attorney General's Statement Regarding Revised Committee Print of Oct. 5, 1945, reprinted in ADMINISTRATIVE PROCEDURE ACT: LEGISLATIVE HISTORY, 79th Cong., 2d Sess. (Comm.Print.1946) at 229 (emphasis supplied). See Great Lakes, 294 F.2d at 223.
 
 
 [31]
 See Great Lakes Airline, 294 F.2d at 222
 
 
 [32]
 See Bankers Life & Cas. Co. v. Callaway, 530 F.2d 625 (5th Cir.1976) (Corps of Engineers permit expired because of the passage of time so no section 9(b) rights attach), cert. denied, 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977); Great Lakes Airline, 294 F.2d at 222 (license that automatically expired 60 days after CAB order issued was not withdrawn, suspended, revoked or annulled within the meaning of section 9(b))
 
 
 [33]
 See ATTORNEY GENERAL'S MANUAL ON THE ADMINISTRATIVE PROCEDURE ACT 91 (1947)
 
 
 [34]
 Blackwell College of Business, 454 F.2d at 933-34
 Under other provisions of the APA, courts have permitted agencies to act without providing a hearing when the hearing would serve no purpose. In Federal Power Comm'n v. Texaco, Inc., 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964), for example, the Supreme Court held that a summary rejection of an application for a certificate of public convenience without a hearing was valid because the application included price clauses prohibited by regulation. Additionally, this court has permitted agencies to use their rulemaking power to particularize statutory standards and deny a hearing to those in violation of the rules. Trans-Pacific Freight Conference v. Federal Maritime Comm'n, 650 F.2d 1235, 1244 (D.C.Cir.1980), cert. denied, 451 U.S. 984, 101 S.Ct. 2315, 68 L.Ed.2d 840 (1981). Finally, this court has long held that the enforcement of conditions to a license does not constitute a "modification" giving rise to an entitlement to a hearing under section 316 of the Communications Act of 1934, 47 U.S.C. Sec. 316(a) (1982). See P & R Temmer v. FCC, 743 F.2d 918, 926-28 (D.C.Cir.1984); Music Broadcasting Co. v. FCC, 217 F.2d 339, 342 (D.C.Cir.1954).
 
 
 [35]
 21 Ship.Reg.Rep. (P & F) 1234 (M.A.1982)
 
 
 [36]
 The difficulty of determining "reasonable rates" in a market that includes subsidized ships as well as unsubsidized ships is illustrated by the Maritime Subsidy Board's recent experience with rate regulation of subsidized ships receiving cargo preferences. The Maritime Subsidy Board allowed a group of vessels receiving operating-differential subsidies to bid for preference cargo. The complexities in the resulting rate regulation resulted in this court twice rejecting the rates set by the Board in the last three years. See American Maritime Ass'n v. United States, 766 F.2d 545 (D.C.Cir.1985) (remanding rates to MarAd for further consideration); Aeron Marine Shipping Co. v. United States, 695 F.2d 567 (D.C.Cir.1982) (same)
 
 
 [37]
 See, e.g., Application of Boston VLCC Tankers, Inc. VI, 19 Ship.Reg.Rep. 43 (M.A.1979) (denying application of CDS vessel to enter Alaskan-Panama Canal oil trade because two unsubsidized vessels were unemployed without any discussion of the reasonableness of rates); Application of Richmond Tankers, Inc., 19 Ship.Reg.Rep. (P & F) 1494 (M.A.1980) (approving application after analysis focused exclusively on expected tanker capacity)
 
 
 [38]
 In the cargo preference section of the Merchant Marine Act, 46 U.S.C. app. Sec. 1241(b) (Supp. I 1983), for example, cargo "shall be transported on privately owned United States-flag commercial vessels, to the extent such vessels are available at fair and reasonable rates for United States-flag commercial vessels."
 
 
 [39]
 The District Court held that the approvals to enter the oil trade did not give ARCO and Maryland Tanker a protected property interest because these approvals are granted at the discretion of MarAd. While the decision to grant an approval may be highly discretionary, Seatrain Shipbuilding Corp. v. Shell Oil Co., 444 U.S. 572, 589, 100 S.Ct. 800, 810, 63 L.Ed.2d 36 (1980), once granted, the approvals gave ARCO and Maryland Tanker a protected property interest. See Barry v. Barchi, 443 U.S. 55, 64, 99 S.Ct. 2642, 2649, 61 L.Ed.2d 365 (1979) (trainer's license was a protected property interest); Bell v. Burson, 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971) (once issued, licenses are "not to be taken away without that procedural due process required by the Fourteenth Amendment")
 
 
 [40]
 See Codd v. Velger, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) (must have factual dispute before hearing required by due process clause)
 
 
 [41]
 See McCachren v. United States Dep't of Agriculture, 599 F.2d 655, 656-57 (5th Cir.1979) (no right to hearing under the due process clause when agreement provided that government could assert its ownership rights to property upon default and farmer admitted he was in default)
 
 
 [42]
 J.A. at 19
 
 
 [43]
 See District Court Record, at 108 (letter from Acturus, Inc. to MarAd)
 
 
 [44]
 See Seatrain Shipbuilding Corp., 444 U.S. at 586-87, 100 S.Ct. at 808-09
 
 
 [45]
 Id. at 588, 100 S.Ct. at 809
 
 
 [46]
 Id
 
 
 [47]
 ARCO also argued that MarAd violated its own regulations by considering the employment of one ship that was not a "competitor." The OGDEN COLUMBIA was a foreign vessel wrecked in United States waters. It was repaired in a United States shipyard at a cost of three times the "appraised salvage value" of the vessel. Under the Wrecked Vessels Act, 46 U.S.C. app. Sec. 14 (Supp. I 1983), the vessel could be registered as a United States vessel. ARCO argues that the regulations require that competitors be "eligible for operation in the domestic trade pursuant to section 27 of the Merchant Marine Act," 46 C.F.R. Sec. 240.2(c) (1984), and therefore vessels that become eligible for the domestic trade pursuant to the Wrecked Vessels Act are not competitors
 We reject this argument. The Wrecked Vessels Act itself does not make a vessel eligible for the domestic trade. It merely allows a vessel to be registered as a United States-flag ship. Instead, these vessels have been long regarded as vessels built in the United States for purposes of section 27 of the Merchant Marine Act, 36 Op.Atty.Gen. 302, 309-11 (1930), and hence MarAd did not err in considering these vessels as qualifying for the domestic trade "pursuant to section 27 of the Merchant Marine Act." 46 C.F.R. Sec. 240.2(c) (1984).