**AMERICAN TRADING TRANSPORTATION COMPANY, INC., et al., Plaintiffs,**

v.

**UNITED STATES of America, et al., Defendants.**

**Civ. A. No. 86–0896.**

United States District Court, District of Columbia.

Feb. 26, 1987.

Anne E. Mickey, Bogle & Gates, Washington, D.C., for plaintiffs.

James Ford, Division of Litigation, Maritime Admin. Dept. of Transp., George P. Williams, Asst. U.S. Atty., Washington, D.C., for defendants.

Michael Joseph, Thomas L. Mills, Dyer, Ellis, Joseph, & Mills, Washington, D.C., for defendants-intervenors.

## MEMORANDUM OPINION

NORMA HOLLOWAY JOHNSON, District Judge.

Plaintiffs, owners and operators of unsubsidized, U.S.-flag, domestic tanker vessels, brought this action for declaratory and injunctive relief against the United States, the Secretary of Transportation (the Secretary), and the Maritime Administrator (MarAd) seeking judicial review, pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq., of a final order issued by MarAd on March 24, 1986. The challenged order allowed American Shipping, Inc. (American), under section 506 of the Merchant Marine Act of 1936 (the Act),[1] 46 U.S.C. § 1156, to temporarily transfer its government-subsidized tanker vessel, the Beaver State, whose operation is generally restricted by the Act to the foreign shipping trade, into the unsubsidized domestic trade for one month to perform two voyages transporting crude oil from Valdez, Alaska, to the U.S. west coast. MarAd's order also granted permission, under section 805(a) of the Act, 46 U.S.C. § 1223(a), to Aquarius Marine Company (Aquarius) and Atlas Marine Company (Atlas), both affiliates of American, to continue receiving certain subsidy payments during the period of the Beaver State's aforesaid domestic operation.[2]

The case is presently before the Court on the motion of plaintiffs for summary judgment, the motion of the federal defendants to affirm the Agency action, and the motion of the intervenor-defendants for summary judgment. The principal issues presented are (1) whether MarAd, in allowing the temporary transfer of the Beaver State into the domestic trade under section 506 of the Act, considered the need for and the competitive effect of such transfer, and (2) whether MarAd was required under section 805(a) to provide a hearing to plaintiffs before issuing his final order. Having considered the motions, the oppositions thereto, the parties' respective legal memoranda, the administrative record herein, and the arguments of counsel, the Court concludes, for reasons that follow, that MarAd's order must be affirmed because it was not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.

### STATUTORY BACKGROUND

The construction and operating costs of American ships have historically been substantially greater than those of foreign vessels. Congress, therefore, has enacted numerous laws designed to foster the development of and protect the United States shipping industry. The "Jones Act", as it is popularly known, 46 U.S.C. § 883, restricts the domestic shipping trade to American-flag vessels. Under the Jones Act, all cargo transported between ports in the United States must be carried on ships built and registered in the United States, and owned by American citizens. Protected in this manner from foreign competition, vessels that operate in the domestic trade, which are often collectively referred to as the "Jones Act fleet", do not receive government subsidies.

Another statute, the Merchant Marine Act of 1936, supra, provides certain subsidies for the benefit of American-flag ships which operate in foreign commerce. These subsidy programs allow U.S.-flag vessels to compete on an equal footing with foreign-

---

**1.** The Merchant Marine Act of 1936 is codified as amended at 46 U.S.C. §§ 1101 et seq.

**2.** By order entered June 2, 1986, American, Aquarius, and Atlas were granted leave to intervene as defendants in this action.

flag vessels in markets open to both foreign and American ships. Subchapter V of the Act, 46 U.S.C. §§ 1151–59, authorizes the Secretary to grant a construction-differential subsidy (CDS) of up to fifty-percent of the cost of a vessel built in the United States. This subsidy is designed to equalize ship construction costs in the United States and foreign countries. Additional financial assistance for American-flag vessels engaged in the foreign shipping trade is provided through payment of an operating-differential subsidy (ODS). Under the ODS program, which is governed by subchapter VI of the Act, 46 U.S.C. §§ 1171–1185, the government pays the shipowner a subsidy to offset higher operating costs with respect to wages, maintenance, and insurance. Recipients of ODS are required to keep their ships under U.S. registry for a specified period (typically 20 years), to maintain certain shipping operations on specified trade routes, and to employ U.S. citizens exclusively.

In order to protect the unsubsidized Jones Act fleet, for which the domestic shipping trade was reserved, from unfair competition from subsidized vessels, Congress enacted section 506 of the Act, 46 U.S.C. § 1156. That section generally prohibits subsidized vessels from entering the domestic trade. Congress did, however, recognize that the unsubsidized fleet may not always be adequate to satisfy the demand for domestic shipping services. Section 506 therefore contains an exception whereby the Secretary may

> consent in writing to a temporary transfer of [a subsidized] vessel to [domestic service] ... for periods not exceeding six months in any year, whenever the Secretary may determine that such transfer is necessary or appropriate to carry out the purposes of [the Act].

46 U.S.C. § 1156. Temporary waiver of the domestic trade restriction for a particular subsidized vessel under this statutory exception is conditioned upon repayment by the shipowner of a proportionate share of the construction-differential subsidy[3] and forfeiture of any operating-differential subsidy during the period of the subsidized vessel's domestic service. *Id.* Although section 506 grants the Secretary authority to consent to such temporary transfers, the Secretary has delegated this authority to MarAd.

Under procedures followed by MarAd, operators of subsidized ships seeking consent to enter the domestic trade on a temporary basis pursuant to section 506 must file a written application with MarAd, who then publishes notice of the application in the Federal Register. Interested parties, typically unsubsidized vessel operators who are potential competitors for the trade for which the waiver is sought, are then given an opportunity to file formal written protests objecting to approval of the application. Following review of the protests and the applicant's response thereto, MarAd decides whether the applicant's entry into the domestic trade is "necessary or appropriate to carry out the purposes" of the Act. Applications are generally denied where any suitable unsubsidized vessel is available to carry the cargo. *See Atlantic Richfield Co. v. United States*, 774 F.2d 1193, 1196 (D.C.Cir.1985). No formal hearing need be held by MarAd in considering a section 506 waiver application and the Supreme Court has characterized MarAd's decision to grant or deny such an application as a "highly discretionary administrative decision." *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 589, 100 S.Ct. 800, 810, 63 L.Ed.2d 36 (1980).

The remaining statutory provision at issue in this case is section 805(a) of the Act, 46 U.S.C. § 1223(a). That section provides, in relevant part, that

> [i]t shall be unlawful to award or pay any subsidy to any contractor under authority of subchapter VI of this chapter, or to charter any vessel to any person under subchapter VII of this chapter, if said contractor or charterer, or any hold-

---

**3.** With respect to the repayment of CDS, section 506 provides that the owner must, in return for the Secretary's consent to transfer, pay the Secretary "an amount which bears the same proportion to the [CDS] paid by the Secretary as such temporary period bears to the entire economic life of the vessel."

ing company, subsidiary, affiliate, or associate of such contractor or charterer, or any officer, director, agent, or executive thereof, directly or indirectly, shall own, operate, or charter any vessel or vessels engaged in the domestic intercoastal or coastwise service, or own any pecuniary interest, directly or indirectly, in any person or concern that owns, charters, or operates any vessel or vessels in the domestic intercoastal or coastwise service, without the written permission of the Secretary of Transportation. Every person, firm, or corporation having any interest in such application shall be permitted to intervene and the Secretary of Transportation shall give a hearing to the applicant and the intervenors. The Secretary of Transportation shall not grant any such application if the Secretary of Transportation finds it will result in unfair competition to any person, firm, or corporation operating exclusively in the coastwise or intercoastal service or that it would be prejudicial to the objects and policy of this chapter.

46 U.S.C. § 1223(a). Briefly and essentially, section 805(a) forbids the payment of ODS to any person who owns or operates vessels in the domestic trade, or to any affiliate of such person, without the written permission of the Secretary.[4] It is designed to prevent the diversion of ODS funds from subsidized foreign trade operations to domestic operations, to the disadvantage of unsubsidized operators. *See e.g., Pacific Far East Line, Inc. v. Federal Maritime Board,* 275 F.2d 184, 186 (D.C. Cir.1960), *cert. denied,* 363 U.S. 827, 80 S.Ct. 1597, 4 L.Ed.2d 1523 (1960). Under section 805(a), MarAd may grant permission to continue receiving ODS payments to a person who operates, or is affiliated with one who operates, a vessel in the domestic trade only where he determines that granting such permission will not result in "unfair competition" to any person operating exclusively in the domestic trade and that the grant of such permission would not be "prejudicial to the objects and policy" of

the Act. A subsidized operator entering the domestic trade, or an affiliate of such an operator, who desires to continue receiving ODS during the period of domestic operation must file a written application for permission with MarAd. Under the statute, the Secretary is directed to allow parties having an "interest" in the application to intervene and to provide a hearing to the applicant and intervenors.

## FACTUAL BACKGROUND

Intervenor-defendant American Shipping, Inc., is the operator of the Beaver State, a 91,849 deadweight ton, U.S.-flag oil tanker that was built by a U.S. shipyard with the aid of a government CDS. The Beaver State's operation is, accordingly, by section 506 of the Merchant Marine Act generally restricted to the foreign shipping trade and American receives ODS payments in connection with the vessel's foreign operations. Intervenor-defendants Aquarius Marine Company and Atlas Marine Company are affiliates of American similarly engaged in the operation of U.S.-flag oil tankers in foreign commerce. Aquarius and Atlas are also recipients of ODS under long-term contracts with the government.

On March 12, 1986, American applied to MarAd for permission under section 506 to operate the Beaver State for about two months in the domestic oil trade between Valdez, Alaska, and the U.S. west coast. The application indicated that the vessel would be under charter to SPC Shipping, Inc. (SPC), a subsidiary of SOHIO, and that it would, if permission were granted, make up to four consecutive voyages carrying crude oil from Valdez, the southern terminus of the Trans-Alaska pipeline, to the west coast. The "lay days", *i.e.,* the days during which the tanker was to be loaded for the first voyage, were stated to be March 20–23, 1986. A.R. 1–2.[5] Also on March 12, Aquarius and Atlas applied, as affiliates of American, for permission under section 805(a) to continue receiving

---

**4.** The Secretary has delegated her authority under section 805(a) to MarAd.

**5.** Citations to the Administrative Record, filed herein on June 12, 1986, will be abbreviated "A.R. _____".

ODS payments during the period of the Beaver State's proposed domestic operation. A.R. 5.

In support of American's section 506 application, SPC, the prospective charterer, submitted a letter to MarAd dated March 12, 1986, indicating (1) that three unsubsidized vessels (presumably under charter to SPC) were unavailable for the voyages due to commitments in the Far East and delays due to repairs and bad weather, (2) that on March 11, 1986, SPC had contacted twelve ship brokers to establish the availability of suitable Jones Act vessels to load at Valdez between March 15 and 25 and found that no such vessels were available, and (3) that there was an "urgent need" for additional, short-term tonnage in the Alaska-west coast oil trade. A.R. 4. The applications under sections 506 and 805(a) were consolidated and MarAd caused appropriate notice to be published in the Federal Register on March 17, 1986, inviting comments by the close of business on March 20.[6]

Thereafter, on March 19, 1986, plaintiff American Trading Transportation Company, Inc. (American Trading), submitted to MarAd a protest to the applications, a petition for leave to intervene, comments, and a request for a public hearing. A.R. 6–12. The following day, counsel for plaintiffs also submitted a formal protest, petition for leave to intervene, and a request for hearing on their behalf. A.R. 13–25. One other firm, OMI Corp., which is not a party to this action, filed a protest on March 20. A.R. 26–27. None of the protestants asserted that it had, or could have, a tanker available to load the crude at Valdez between March 15 and 25, 1986. OMI Corp., however, did state that one of its vessels would be available in early to mid-April and suggested that, in the event no Jones Act ships were available to satisfy the immediate need, MarAd should permit the Beaver State to make only one of the requested voyages, following which suitable Jones Act vessels would be available to transport the cargo. The six protestants which are plaintiffs here indicated that they would

not have a tanker available to load at Valdez until the end of April, 1986.

On March 21, 1986, SPC by telex responded to the protests and requested prompt approval of the applications to avoid costly delays. It stated that each protestant had been aware of its needs since at least March 11, that none was able to offer a vessel during the required period, and that failure to transport the oil within the given time frame would result in inventory problems. A.R. 28–30.

On the same date as the SPC telex, MarAd approved a recommendation from his staff and granted permission for the Beaver State to operate for approximately one month in the Valdez-west coast trade and make two of the four voyages for which permission was sought. A.R. 31–33. Telephonic notice of MarAd's action was provided to plaintiffs before the close of business on March 21. Formal approval of the applications was issued on March 24, 1986. A.R. 34–36. That approval indicates that MarAd considered the timely comments and petitions of the plaintiffs protesting approval of the applications, but found that "none of the protestors had any ships ... available to operate in the domestic Alaskan oil trade [during] the time period covered by the two approved voyages." A.R. 35. In his final decision, MarAd determined:

(1) that the transfer of the Beaver State to the domestic trade for approximately one month was necessary or appropriate to carry out the purposes of the Act;

(2) that repayment of CDS by American in accordance with section 506 was required and that this approval should not be construed as a precedent for approval of tankers of less than 100,-000 deadweight tons in the Alaskan oil trade;

(3) that the Beaver State would not receive any ODS payments during the period of its domestic operation;

(4) that Aquarius and Atlas could continue to be affiliated with American and receive ODS payments during the peri-

6. *See* 51 *Fed.Reg.* 9134

od of the Beaver State's domestic operation;

(5) that no party had an "interest" within the meaning of section 805(a) in the two voyages which would necessitate a hearing inasmuch as no suitable competitive Jones Act vessels were available to meet the transportation needs of the shipper;

(6) that under section 805(a) the granting of the application, as limited, would not result in unfair competition with any exclusive domestic operator or be prejudicial to the objects and policy of the Act; and

(7) that OMI Corp. may have one or more vessels available after the approximate time that the Beaver State would complete its two approved voyages.

A.R. 34–36.

Thereafter, the Beaver State, which at the time of MarAd's decision was located at Portland, Oregon, arrived at Valdez on March 26, 1986, departed with its first cargo on March 29 and discharged the cargo at San Francisco on April 10. It returned to Valdez on April 16, departed again on April 18, and completed the second voyage on April 27, 1986. Plaintiffs commenced the instant action on April 3, 1986.

## ANALYSIS

■ At the outset, the Court notes that judicial review of the MarAd decision challenged in this case is pursuant to section 706(2)(A) of the Administrative Procedure Act, which provides that the Court shall "hold unlawful and set aside" agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[7] Under this standard, MarAd's decision is entitled to a presumption of regularity and the Court is not to substitute its judgment for MarAd's *Independent U.S. Tanker Owners Committee v. Lewis* (ITOC), 690 F.2d 908, 922 (D.C.Cir. 1982) (citing *Citizens to Preserve Overton*

*Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). While the Court must nevertheless conduct a "searching and careful" review of the challenged agency action, *Citizens to Preserve Overton Park, supra,* at 416, 91 S.Ct. at 823. MarAd's decision should be upheld where it appears that he has "adequately considered all relevant factors ... and that [he] has demonstrated 'a rational connection between the facts found and the choices made.'" *ITOC, supra,* at 922 (quoting *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 35 (D.C.Cir.1977), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977)). With this standard in mind, the Court will consider separately, first, MarAd's consent under section 506 of the Act to the temporary transfer of the Beaver State into the Alaska-west coast domestic trade and, second, MarAd's grant of permission under section 805(a) to Aquarius and Atlas to continue receiving ODS during the period of the Beaver State's domestic operation.

## The Section 506 Decision

■ As set forth above, MarAd may under section 506 consent to the temporary transfer of a subsidized vessel such as the Beaver State into the domestic trade upon a determination that such transfer is "necessary or appropriate to carry out the purposes of" the Act. As was recognized by our Court of Appeals in *Atlantic Richfield Company v. United States,* 774 F.2d 1193 (D.C.Cir.1985), MarAd decides whether a section 506 applicant's entry into the domestic trade is "necessary or appropriate" after reviewing the application, written protests from competitors, and the responses to the protests. *Id.* at 1196. No formal hearing need be held by MarAd with respect to a section 506 application;[8] and the Supreme Court has characterized MarAd's decision to grant or deny such an application as a "highly discretionary administrative decision." *Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 589, 100 S.Ct. 800, 810, 63 L.Ed.2d 36 (1980).

---

7. *See* Complaint, ¶¶ 1, 19–26.

8. Counsel for plaintiffs conceded this point in open court at the hearing on the pending motions.

An applicant seeking a temporary transfer may establish that there is a need for the transfer by showing that there is (1) work to be done, i.e., cargo to be carried, and (2) no suitable unsubsidized vessel available to do it. *American Trading Transportation Company, Inc. v. United States,* 791 F.2d 942, 950 (D.C.Cir.1986).[9] Once MarAd is satisfied that these conditions exist, he must, before granting the application, also consider statutory concerns such as the "impact of the requested waiver on the remainder of the unsubsidized fleet." *Id.* at 950.

■ Plaintiffs contend that the approval of the Beaver State's one-month temporary transfer was unlawful because MarAd "failed to consider the need for and competitive effect of" the transfer on the unsubsidized fleet.[10] This argument appears frivolous in light of the record before the Court. Both American, the applicant and operator of the Beaver State, and SPC, the shipper seeking to charter the vessel, asserted in their submissions to MarAd (1) that there was cargo to be carried from Valdez commencing in March 1986 and (2) that there was no unsubsidized ship then available to do the work. None of the plaintiffs asserted before the Agency that it had, or could have, a tanker available to load at Valdez prior to the end of April 1986.[11] Based on the record before him, MarAd was amply justified in finding that the requisite showing for a waiver had been made and that the transfer was "necessary or appropriate" within the meaning of section 506. Implicit in MarAd's decision is the determination that the Beaver State's entry into the Valdez-west coast trade, as limited, would have *no competitive impact* on plaintiffs in view of the undisputed unavailability of any of their ships to operate in that trade during the time period covered by the two approved voyages.[12]

■ Plaintiffs also argue, with respect to the section 506 decision, that approval of the Beaver State's application was unlawful because MarAd failed "to determine the authenticity of [the] claim of need."[13] Plaintiffs, however, have cited no authority placing upon MarAd the duty to make such a determination and the Court is aware of none. MarAd's statutory mandate under the Merchant Marine Act of 1936 is not to regulate the production and flow of oil in and from Alaska, or to second-guess the decisions of the oil companies engaged in that business. It is, rather, as our Court of Appeals has repeatedly recognized, to protect the unsubsidized domestic fleet from displacement by the subsidized fleet while still ensuring adequate domestic shipping capacity. *American Trading Transportation Company, Inc. v. United States, supra,* at 950; *Atlantic Richfield Company v. United States, supra,* at 1203. The Court is satisfied, under the particular factual situation presented here, that MarAd's approval of the limited temporary transfer of the Beaver State into the domestic trade was consistent with, and faithful to, the purposes of the Act and, therefore, concludes that his decision must be affirmed.

---

**9.** The Court notes that the MarAd regulations governing section 506 applications, which were at issue in *American Trading,* are not applicable here as they apply only to waivers for subsidized ships over 100,000 deadweight tons to participate in the longest leg of the Alaska oil trade, i.e., from Valdez to the Panama Canal. *See* 46 C.F.R. Part 250. The Court's comments, however, regarding the showing required by an applicant for a waiver would nonetheless appear applicable here.

**10.** *See* plaintiffs' memorandum in support of their motion for summary judgment, pp. 21–32.

**11.** Counsel for plaintiffs also conceded this point at the hearing on the instant motions.

**12.** Plaintiffs' "bumping" argument, suggesting that unsubsidized ships would be displaced by approval of the Beaver State's application, appears incomprehensible. The *American Trading* case, *supra,* upon which plaintiffs heavily rely in support of this argument, is markedly distinguishable from the instant case. *American Trading* involved the approval of waivers allowing subsidized "very large crude carriers" to enter the Valdez-Panama Canal trade during a period when there were smaller, unsubsidized ships available and, in fact, already operating in that trade which were displaced, or "bumped" from the trade by the entry of the larger vessels. This is not such a case.

**13.** Plaintiffs' memorandum, pp. 27–29.

*The Section 805(a) Decision*

■ There remains for consideration the question whether MarAd was required to afford plaintiffs a hearing with respect to the section 805(a) applications of the intervenor-defendants. As set forth above, section 805(a) forbids payment of ODS to any person who owns or operates vessels in the domestic trade, or to any affiliate of such person, without the written permission of the Secretary. The purpose of the statute is to prevent the diversion of ODS funds from subsidized foreign operations to domestic operations, to the disadvantage of an unsubsidized operator. *Pacific Far East Line, Inc. v. Federal Maritime Board,* 275 F.2d 184, 186 (D.C.Cir.1960), *cert. denied,* 363 U.S. 827, 80 S.Ct. 1597, 4 L.Ed.2d 1523 (1960); *Matson Navigation Company v. Connor,* 258 F.Supp. 144, 153 (N.D.Cal.1966), *aff'd per curiam,* 394 F.2d 514 (9th Cir.1968). Section 805(a) requires denial of permission for subsidized operators, or their affiliates, to receive ODS where such permission would result in "unfair competition", or would be "prejudicial to the object and policy of" the Act. The statute directs the Secretary to allow parties having an "interest" in a section 805(a) application to intervene and to provide a hearing to the applicant and intervenors.

■ Plaintiffs contend that American, as operator of the Beaver State, was required to submit an application under section 805(a) because the ship would receive a "residual subsidy benefit" during the period of its domestic operation and that MarAd was required to provide them with a hearing to resolve the issue whether the Beaver State's entry into the domestic trade and the continued payment of ODS to Aquarius and Atlas during the period of the Beaver State's domestic operation would result in unfair competition to them or be prejudicial to the objects and policy of the Act. The Court is of the view that these arguments are without merit and must be rejected. First of all, American was not required to seek permission under section 805(a) because its ODS subsidies for the Beaver State were to be automatically forfeited pursuant to section 506 dur-

ing the ship's domestic service; and there is nothing in section 805(a) which requires Secretarial permission for receipt of a "residual subsidy benefit". Secondly, with respect to the section 805(a) applications of American's affiliates, Atlas and Aquarius, MarAd's determination that the plaintiffs had no "interest" necessitating a hearing appears entirely reasonable in light of the fact that no competitive situation was presented by the Beaver State's one month transfer into the Valdez-west coast oil trade. It appears well within the Secretary's broad and substantial discretion in administering the Act to determine whether a party alleging an interest warranting a hearing on a particular section 805(a) application in fact has one. This would seem especially true in the context of a factual situation such as that presented here. Were it otherwise, a hearing would be required on every such application where an unsubsidized operator protested, whether or not the protestant was a competitor or potential competitor of the applicant or its affiliate, in the trade for which a waiver was sought. This cannot be the result intended under section 805.

### CONCLUSION

For all the foregoing reasons, the Court concludes that MarAd's decision of March 24, 1986, was not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. Plaintiffs' motion for summary judgment must, therefore, be denied and the motions of the federal and intervenor-defendants granted. An appropriate order and judgment will be entered together with this opinion.

### ORDER AND JUDGMENT

Upon consideration of the motion of plaintiffs for summary judgment, the motion of the federal defendants to affirm the Agency action, the motion of the intervenor-defendants for summary judgment, the oppositions thereto, the parties' respective legal memoranda, the administrative record, and the arguments of counsel, the Court concludes, for reasons set forth in the accompanying memorandum opinion,

that the motion of plaintiffs must be denied and those of the defendants granted. It is, accordingly, this 26th day of February, 1987,

ORDERED AND ADJUDGED that the plaintiffs' motion for summary judgment be, and hereby is, denied; it is further

ORDERED AND ADJUDGED that the motions of the federal and intervenor-defendants be, and hereby are, granted; and it is further

ORDERED AND ADJUDGED that the complaint be, and hereby is, dismissed on the merits.