**GEORGIA–PACIFIC CORPORATION, Petitioner,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

**No. 80–7665.**

United States Court of Appeals, Ninth Circuit.

Argued Jan. 7, 1982.

Submitted Jan. 21, 1982.

Decided March 18, 1982.

---

Robert R. Davis, Jr., Seattle, Wash., argued, for petitioner; G. Keith Grim, Lane, Powell, Moss & Miller, Seattle, Wash., on brief.

Peter D. Holmes, Atty., EPA, Rosanne Mayer, Pollution Control Sec., Washington, D. C., for respondent.

Before ANDERSON and ALARCON, Circuit Judges, and COUGHENOUR,* District Judge.

COUGHENOUR, District Judge:

Petitioner Georgia-Pacific Corporation operates a paper, pulp and chemical facility at Bellingham, Washington. In 1978 Georgia-Pacific sought a variance from certain effluent guidelines promulgated pursuant to the Federal Water Pollution Control Act Amendments.[1] The Environmental Protection Agency ("EPA") denied the request. Petitioner urges that the EPA determination was defective, both in procedure and result. We disagree.

A. Regulatory Scheme

 Under the Federal Water Pollution Control Act, as amended in 1972 (hereinafter "the Control Act"),[2] it is unlawful to discharge any pollutant into a navigable water[3] without first obtaining a permit under Section 402 of the Control Act. 33

U.S.C.A. § 1342(a)(1) (1977 Supp.). Section 402(a) of the Control Act[4] authorizes the Administrator of the EPA to issue a permit if he determines, *inter alia*, that the discharge would meet the requirements of Section 301 of the Control Act.[5] Section 301(b)(1)(A)[6] in turn requires, prior to July 1, 1983, the application of the "best practicable control technology currently available" ("BPT"), as defined in Section 304(b)(1) of the Control Act.[7] Although these standards are commonly known as "guidelines," it is clear that the prescriptions therein are mandatory; absent a variance they *must* be incorporated into the National Pollution Discharge Elimination System ("NPDES") permits issued by the EPA or the state to individual point source dischargers.[8] Georgia-Pacific's Bellingham complex is such a point source.

On January 6, 1977, the EPA promulgated BPT effluent limitation guidelines[9] for that segment of the pulp and paper industry of which Georgia-Pacific's Bellingham facility is a member.[10] In so doing the EPA examined the pollution-control practices of over 300 mills in the "bleached" segment of the industry, including the Georgia-Pacific Bellingham plant. The regulations divide that segment of the industry into sixteen categories and establish different effluent limitations, based on the average practices of the most exemplary mills, for each subcategory. These limitations were established for three separate pollutants: biochemical oxygent demand ("BOD"), total suspended solids ("TSS"), and pH. It is the BOD and TSS limitations from which Georgia-Pacific seeks a variance for its Bellingham facility.

---

* Of the Western District of Washington.

1. 33 U.S.C. § 1251 et seq. (1977 Supp.)

2. *Id.*

3. *Id.* § 1311(a).

4. *Id.* § 1342(a).

5. *Id.* § 1311.

6. *Id.* § 1311(b)(1)(A).

7. *Id.* § 1314(b)(1).

8. For a further discussion of the relationship between effluent guidelines and permit limita-

tions, *see E. I. duPont de Nemours & Co. v. Train*, 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977).

9. 42 Fed.Reg. 1398 et seq. (codified at 40 C.F.R. Part 430).

10. The pulping processes employed by the industry are fully described in the Development Document relied on by the EPA in promulgating the relevant regulations, and have been discussed by the District of Columbia Circuit in *Weyerhaeuser Co. v. Castle*, 590 F.2d 1011 (D.C.Cir.1978).

The guidelines provide for variances from these limitations, in special circumstances, when the guidelines are applied to individual plants through inclusion in NPDES permits. Specifically, they provide for variances based on a finding of "fundamentally different factors." [11] Petitioner Georgia-Pacific contends that such factors exist at its Bellingham facility. It is on this basis that it seeks the variance which is the subject of this appeal.

B. Facts

The relevant facts are largely undisputed and bear only brief recital here. Petitioner initially received an NPDES permit from the State of Washington's Department of Ecology ("DOE")—which is charged with administering the NPDES permit program in Washington State—for the discharge of pollutants from its Bellingham facility. The limitations set forth in the permit were based on industry-wide BPT effluent guidelines promulgated by the EPA. On August 15, 1978 Georgia-Pacific requested an FDF variance from DOE to establish more lenient effluent limitations for BOD and TSS in the discharge from its Bellingham facility. Petitioner based this request on the existence and operation of an alcohol and by-products facility at the Bellingham complex. The alcohol and by-products plant functions as an independent component in an integrated whole. Sulfite waste liquor from the pulping process is pumped to the alcohol plant where it is converted into alcohol, and, with the addition of other chemicals, a variety of other products. The alcohol plant also produces a raw waste load which must ultimately be treated, along with that of the pulp mill, at a wastewater treatment plant. Petitioner argues that it is this added waste load which warrants an additional discharge allowance in the Bellingham facility's NPDES permit.

In the variance request submitted to the DOE, Georgia-Pacific directed the Department's attention to a Weyerhaeuser pulp mill in Wisconsin which sells its sulfite waste liquor to a neighboring by-products facility owned by the American Can Company. The State of Wisconsin, which administers the NPDES program there, apparently established separate effluent limitations for the American Can by-products facility and the Weyerhaeuser pulp plant. In its request to the DOE Georgia-Pacific argued that an additional waste liquor allowance was no less appropriate when the same facility produced both pulp and alcohol by-products.

The DOE agreed. It granted petitioner's request for an FDF variance, although in so doing it reduced the requested allowance. Because all FDF variances must be approved by the EPA,[12] the DOE, on January

11. 42 Fed.Reg. 1416–17 (1977) (codified at 40 C.F.R. § 430.212). In pertinent part the variance procedure provides:

"In establishing the limitations set forth in this section, EPA took into account all information it was able to collect, develop and solicit with respect to factors (such as age and size of the plant, raw materials, manufacturing processes, products produced, treatment technology available, energy requirements and costs) which can affect the industry subcategorization and effluent levels established. It is, however, possible that data which would affect these limitations have not been available and, as a result, these limitations should be adjusted for certain plants in this industry. An individual discharger or other interested person may submit to the Regional Administrator (or to the State, if the State has the authority to issue NPDES permits) that factors relating to the equipment or facilities involved, the process applied, or other such factors related to such discharger are *fundamentally different* from the factors considered in the establishment of the guidelines. On the basis of such evidence or other available information, the Regional Administrator (or the State) will make a written finding that such factors are or are not fundamentally different for that facility compared to those specified in the Development Document. If such fundamentally different factors are found to exist the Regional Administrator or the State shall establish for the discharge effluent limitations in the NPDES permit either more or less stringent than the limitations established herein, to the extent dictated by such fundamentally different factors. Such limitations must be approved by the Administrator of the Environmental Protection Agency. The Administrator may approve or disapprove such limitations, specify other limitations, or initiate proceedings to revise these regulations." (Emphasis supplied)

12. 40 C.F.R. § 430.212.

24, 1979, requested EPA approval of the variance. After at least two informal meetings between Georgia-Pacific and EPA representatives the EPA, on January 17, 1980, issued its "Recommended Determination" to deny the variance. Both petitioner and the DOE submitted comments on the Recommended Determination to the EPA. Sometime in August of 1980 the Acting Administrator of the EPA issued a Final Determination, denying the variance. The EPA found that although Georgia-Pacific's method of spent sulfite recovery and its by-product processes were unique, the total raw waste load from the entire pulping operation was less than that used for setting the effluent guidelines. The EPA further concluded that the additional production facilities did not have a significant impact on the total raw waste level and they did not create a fundamentally different factor sufficient to justify a variance. Georgia-Pacific petitions for review of that decision.

## C. Jurisdiction

At the outset we consider the threshold question of whether the Court has jurisdiction to hear the appeal. The issue before us is a seemingly simple one: Was petitioner timely in filing its petition for review?

Section 509(b)(1)(F) of the Clean Water Act,[13] which provides the basis for this Court's jurisdiction here, requires that any petition for review of the Administrator's action in "issuing or denying" an NPDES permit be filed within ninety days from the date of issuance or denial, unless the petition is based solely on grounds that arose after the ninetieth day.[14] The Supreme Court has approved the application of this section in the context of a variance denial under a state-administered NPDES program. *Crown Simpson Pulp Company v. Costle*, 445 U.S. 193, 100 S.Ct. 1093, 63

L.Ed.2d 312 (1980). We find it applicable here.

The facts bearing on the timeliness of the appeal can be briefly summarized. The EPA's Final Decision denying the requested variance is dated August 21, 1980. For reasons on which the record provides little illumination, petitioner was sent no notice of the denial until August 28, 1980, on which date a letter to that effect was sent to Georgia-Pacific. The record is silent as to the date on which petitioner received the letter. We will assume that the letter was three days in the mails and was received on or about August 31st. Georgia-Pacific's Petition for Review was dated November 19, 1980, mailed to the Court on November 20th, and received by the Clerk on November 24, 1980. The applicable section of the Clean Water Act is unequivocal in its requirement that application for review shall be made within ninety days of "issuance or denial." The ninetieth day from August 21, the date which appears on the EPA denial, is November 19th. The ninetieth day after August 31, the date on which we assume petitioner received notice of the denial, is November 29th. Thus, the petition was timely if the ninety days began to run on the day the petitioner received notice of the denial, and delinquent if dating the decision was sufficient to trigger the limitations period.

The limited task before us, then, is one of construing "issuance or denial" as those terms are used in Section 509(b)(1)(F) of the Clean Water Act. It is urged that a variance can be neither "issued" or "denied" until such time as the applicant receives notice of that action. In the absence of expressly applicable regulatory construction of those terms we reach the same conclusion, although not without reservation.

---

**13.** 33 U.S.C. § 1369(b)(1)(F).

**14.** *Id.* The pertinent language in the statute provides:

"Review of the Administrator's action ... (F) in issuing or denying any permit under section 402 of this title, may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal

judicial district in which such person resides or transacts business upon application by such person. Any such application shall be made *within ninety days from the date of such* ... issuance or denial, or after such date only if such application is based solely on grounds which arose after such ninetieth day."

We turn first to an examination of EPA-promulgated regulations in effect at the time the variance denial was issued in the instant matter.[15] We begin by noting that the regulations are silent as to the construction of the terms at issue, at least in the context of variance requests. However, there were in effect at the time regulations which addressed the definition of "issuance" as the term applies to EPA-issued *permits.* With no more expressly applicable authority before us we believe that we can reason by analogy from these agency-promulgated definitions. At the time petitioner took its appeal the applicable regulations were codified at 40 C.F.R. § 125.35 (1975).[16] In essence, the language of the relevant subsection provides that the "date of issuance of a permit" shall be the date its provisions become effective. 40 C.F.R. § 125.35(d)(1) (1975). Absent other considerations, "The permit shall take effect thirty (30) days after the date of the determination . . . ."[17] *Id.* "The period within which a person may request an adjudicatory hearing . . . shall commence on *the date of receipt of the determination* of the Regional Administrator." *Id.* (Emphasis supplied) Moreover, the regulation contains considerable additional language which would strongly suggest that *notice* of the determination is a necessary antecedent to the permit's "effective date," which in turn is synonymous with the "date of issuance."[18]

■ That "issuance or denial" should be predicated on effective notice seems to us eminently reasonable. It seemed no less so to the Supreme Court, which similarly defined "issuance" in the context of Federal Power Commission action in issuing a certificate pursuant to the provisions of the Natural Gas Act. *Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950). Writing for the Court, Mr. Justice Frankfurter said:

> "Surely a certificate cannot be said to have been issued for purposes of defining rights and the seeking of reconsideration by an aggrieved person if its substance is merely in the bosom of the Commission. Knowledge of the substance must to some extent be made manifest."

*Skelly Oil Co. v. Phillips Petroleum Co., supra,* 70 S.Ct. at 881. We agree. ⁕ Although the date which appeared on the variance denial should have served to alert petitioner to expect the running of the limitations period on or about the ninetieth day *thereafter,* in the absence of a definitive regulation we believe that the better construction of "issuance or denial" argues here for an equitable tolling of the ninety days until such time as the variance applicant receives effective notice of the Administrator's determination. We find, accordingly, that the petition was timely and that this Court has jurisdiction to hear the appeal. We emphasize, however, that our holding is a narrow one, applicable only to

---

**15.** The Clean Water Act itself provides little or no assistance in construing the terms at issue here; no good purpose will be served by a labyrinthine pursuit of congressional intent. Construction of the Act's provisions is the province of the EPA, the agency charged with the Act's enforcement.

**16.** The applicable text of these regulations provides in pertinent part:

40 C.F.R. § 125.35 Issuance and effective date of permit.

"(d)(1) Except as provided in subparagraph (2) of this paragraph, the date of issuance of a permit shall be the date all provisions of a permit become effective. The period within which a person may request an adjudicatory hearing pursuant to § 125.36(b)(1) of this subpart shall commence on the date of receipt of the determination of the Regional Administrator. The permit shall take effect thirty (30) days after the date of the determi-

nation unless a later effective date is specified in the determination."
The Second Circuit has upheld these regulations as a reasonable construction of the term "issuance" as it is used in Section 402(c)(1) of the Clean Water Act, 33 U.S.C. § 1342(c)(1). *Central Hudson Gas & Electric Corp. v. EPA,* 587 F.2d 549, 561 (2d Cir. 1978).

**17.** Although this calculus, if strictly applied here, would make the denial "effective," ergo "issued," thirty days after August 21st, the date which appears on the denial, because the regulation does not expressly apply to variances we do not find it controlling. Rather, we infer only that the agency, in promulgating the regulation, contemplated an arbitrary period in which notice would be effected, prior to actual "issuance."

**18.** *See* 40 C.F.R. § 125.35(b) and (c).

the terms at issue in the context of their use in Section 509(b)(1)(F) of the Clean Water Act. Should the EPA seek stricter adherence to the ninety-day limit prescribed in the Act we suggest the promulgation of an appropriate regulation, expressly applicable to variance requests, which would explicitly define "issuance or denial" in that context.

### D. Procedural Objections

Georgia-Pacific contends that it should have been afforded an adversarial hearing sometime prior to EPA issuance of the Final Decision on the requested variance. Although petitioner concedes that it was granted the opportunity to comment upon the Recommended Decision, it argues that comment, alone, is inadequate protection. Petitioner also argues that in reaching its final decision the EPA departed substantially from the determinations in its Recommended Decision. In its response the EPA urges that (1) because there existed no disputed issues of material fact no hearing was warranted, and (2) that even if a hearing *had* been available, petitioner waived it by failing to request one at any time prior to petitioning this Court for review.

### 1. Alleged Factual Disputes

Petitioner urges that the EPA variance review was procedurally defective because the Final Decision allegedly advanced two new theories for the variance denial: A comparison of petitioner's Bellingham plant to the Wisconsin mills,[19] and certain conclusions drawn from the finding of increased oxygen usage at Bellingham.[20]

It is well-established that before a hearing is required in a permit application proceeding the applicant must "meet a threshold burden of tendering evidence suggesting the need for a hearing." *Costle v. Pacific Legal Foundation*, 445 U.S. 198, 214, 100 S.Ct. 1095, 1105, 63 L.Ed.2d 329 (1980), citing *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 620–21, 93 S.Ct. 2469, 2478–79, 37 L.Ed.2d 207 (1973). There must be factual, rather than purely legal issues in dispute. *See Costle, supra,* 445 U.S. at 219–29, 100 S.Ct. at 1107–08; *Marathon Oil v. EPA*, 564 F.2d 1253, 1262 (9th Cir. 1977). Moreover, the Supreme Court emphasized in *Costle, supra,* that without adherence to this standard, administration of the NPDES program could be jeopardized by a rule that required hearings as a matter of course. 445 U.S. at 213–16, 100 S.Ct. at 1104–06. For this reason a permittee must demonstrate that there exist disputed issues of material fact before a hearing will be afforded. Georgia-Pacific's argument that the EPA should have held a hearing in order to "sharpen the issues" and "fully develop the facts" does not meet this test. An examination of the record suggests that the essential facts relevant to the Bellingham facility were never in dispute. Even if the EPA did, during the course of its proceedings, compare petitioner's Bellingham complex with the Wisconsin plant, the record suggests that the decision to deny the variance was based on an EPA finding that Georgia-Pacific's total raw waste load was not fundamentally different from the raw waste load on which the effluent guidelines were based. The Wiscon-

---

**19.** In its Final Decision EPA rejected Georgia-Pacific's comparison of its Bellingham operation to two Wisconsin facilities which also performed pulping and by-products operations, although under separate ownership, and which had been granted separate permits. The EPA compared the percentage of BOD removal at the two sites and found that it was not discriminatory to deny a variance to Georgia-Pacific. Petitioner argues that the BOD comparison raised a new issue that was wrongly resolved by the EPA. In responding the EPA attempted to refute Georgia-Pacific's assertion that a comparison of the two facilities would require the issuance of a variance in this matter.

**20.** Petitioner contends that the increased oxygen usage at its Bellingham facility is the result of greater raw waste loads produced by the alcohol and by-products facilities. It argues that its oxygen usage data was submitted to show these greater and more complex waste loads. The EPA held in its Final Decision that the oxygen usage levels that were employed in establishing guidelines were used to calculate the costs of implementing the limitations, and not to select the treatment systems forming the basis for the limitations or the limitations themselves.

sin facility presents no new question of material fact.

Nor are we persuaded by petitioner's argument that the issue of oxygen use at the Bellingham facility was raised for the first time in the Final Determination. Not only does the record indicate that it was petitioner itself which first raised the issue,[21] but because it appears that increased oxygen usage does not affect the industry's ability to achieve the prescribed effluent limitations, we do not see the relevance of Georgia-Pacific's data to establishing a fundamentally different factor. Since we are persuaded that there were no material issues of fact in dispute, the failure to provide a hearing did not render EPA's variance denial procedures defective.

### 2. Waiver

■ Did petitioner waive its right to any hearing to which it may have been entitled? A review of the record before us persuades us that it did. At no time prior to taking this appeal did petitioner request such a hearing, either from the Department of Ecology or the EPA. Petitioner correctly points out that at the time at which the EPA received the DOE decision there was no established administrative procedure to govern EPA review of state-granted variance requests.[22] The suggestion is that the absence of regulatory procedures somehow acted as a prohibition against requesting the hearing for which the regulations made no provision, but which petitioner claims to have sought. We are not persuaded. We find it more logical to have assumed that

the silence of the regulations as to the availability of a hearing was permissive. In the absence of an explicit prohibition the prudent course would have been to request the hearing. Surely such a request could have been made at some point during the year-and-a-half that the matter was before the EPA.

Georgia-Pacific maintains that because an adversarial hearing is, in some cases, required before a ruling on an NPDES permit application, that by analogy such a hearing is required before a ruling on a variance request. We note, however, that in the context of permit applications the Supreme Court has recently held that all that Section 402 of the Clean Water Act requires is an *"opportunity* for a public hearing," and that such an opportunity "may be keyed to a *request* for a hearing." *Costle v. Pacific Legal Foundation*, 445 U.S. 198, 214, 100 S.Ct. 1095, 1105, 63 L.Ed.2d 329 (1980) (emphasis supplied).[23] The Court there held that because respondents had failed to request a hearing, the EPA's failure to provide one did not invalidate EPA's action on the permit in issue.

Respondent invokes the generally followed rule of administrative law that "absent exceptional circumstances, a reviewing court will refuse to consider contentions not presented before the administrative proceeding at the appropriate time." *Getty Oil Co. v. Andrus*, 607 F.2d 253, 256 (9th Cir. 1979); *see, also, United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952). The rule seems to us to be a reasonable one, and, if consci-

---

**21.** The issue appears to have first been raised in a December 7, 1979 letter to the EPA. EPA did not issue its Recommended Determination until January 17, 1980.

**22.** During EPA's consideration of the variance request, the Agency promulgated regulations regarding NPDES permits, which established criteria and standards for determining FDF variances. 40 C.F.R. Part 125, subpart D, 44 Fed. Reg. 32950–32951. It also established procedures for decisions on variances and modifications. 40 C.F.R. § 124.52–.54, 44 Fed.Reg. 32934–32935, *as recodified* 40 C.F.R. §§ 124.-62–.64. Although the EPA did not consider the Georgia-Pacific variance request under these procedures, it should be noted that the new

regulations expressly require dischargers to *request* a hearing after the recommended denial of a variance in order to receive such a hearing. *See* 40 C.F.R. § 124.54(a) (originally promulgated June 7, 1979).

**23.** The Supreme Court's ruling in *Pacific Legal Foundation* follows a long line of cases in which relief has been denied to a petitioner who has failed to timely request a hearing before an administrative agency. This is sometimes the result even in the absence of regulations expressly requiring such a request. *See, e.g., Goldsmith v. United States Board of Tax Appeals*, 270 U.S. 117, 123, 46 S.Ct. 215, 217, 70 L.Ed. 494 (1926).

entiously applied, one likely to lead to greater efficiency in agency procedures.

We do not believe that our finding that petitioner waived its right to the hearing is a particularly harsh result, particularly in view of our conviction that petitioner's variance request raised legal rather than factual issues, and our belief that an adversarial hearing would not have been warranted even had Georgia-Pacific timely requested one.

### E. Alleged Substantive Defects

It is petitioner's position that even if the Court determines that EPA's actions were not procedurally defective it should reverse the EPA's Final Decision and reinstate the decision rendered by DOE, on a finding that the variance denial was arbitrary, capricious and an abuse of discretion. We decline to do so.

### 1. Standard of Review

There is no dispute as to the standard of review to be applied here. Only if the Final Decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," must it be set aside. 5 U.S.C. § 706(2)(A). This Court has recently noted that the task inherent in reviewing agency action under such a standard "is to insure that the Agency has accumulated sufficient material upon which to make a reasoned decision, reviewed that material, and promulgated regulations that are the result of reasoned decisionmaking." *Association of Pacific Fisheries v. EPA*, 615 F.2d 794, 803 (9th Cir. 1980) (citations omitted). The duties delineated in that decision are consistent with those specified by the Supreme Court in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

### 2. FDF Variances Generally

In setting BPT effluent limitations for the pulp and paper industry the EPA examined a broad range of mills within the industry, including Georgia-Pacific's Bellingham complex, looked at the mills with the best pollution control systems, and set BPT guidelines according to the average performance of those exemplary mills. To se-

cure an FDF variance from these guidelines a mill must demonstrate that its facility is fundamentally different from the range of circumstances considered by the agency in setting BPT limitations. About such procedures the Supreme Court has noted:

> "If a point source can show that its situation ... is not within the range of circumstances considered by the Administrator, then it may receive a variance .... In such situations, the variance is an acknowledgement that the uniform BPT limitation was set without reference to the full range of current practices, to which the Administrator was to refer."

*EPA v. National Crushed Stone Association*, 449 U.S. 64, 101 S.Ct. 294, 304, 66 L.Ed.2d 268 (1980).

The District of Columbia Circuit has explained that an FDF variance "is not a license for avoidance of the Act's strict pollution control requirements." *Weyerhaeuser v. Costle*, 590 F.2d 1011, 1035 (D.C. Cir.1978). That same Court, in addressing the variance provisions in the regulations for the pulp and paper industry, noted that a variance request "simply allows individual operators to argue that, given the overall impact of an effluent limitation on their operations, they are faced with *stricter* requirements than the Act authorizes EPA to place on industry as a whole." (Emphasis in the original) *Id.* Moreover, the *Weyerhaeuser* Court concluded that "the requirement that the difference between the individual and national situations ... is fundamental" to assure "that the pin-hole safety valve envisioned in the Act and *duPont* [430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204] does not become a yawning loophole." *Weyerhaeuser v. Costle, supra*, 590 F.2d at 1040. Our review of this matter does not persuade us that petitioner is being held to a stricter standard than the industry as a whole, nor that there exist fundamentally different factors at the Bellingham complex which would warrant a variance.

### 3. Petitioner's "Arbitrary and Capricious" Argument

Petitioner's argument first addresses EPA's finding that Georgia-Pacific's alcohol plant and by-products facilities are func-

tionally integrated with the pulping operation, and that the raw waste load from the entire complex was no greater than that from comparable mills. Petitioner contends that the two operations are separate.

EPA does not dispute the fact that Georgia-Pacific's by-products processes are unique, nor that these processes produce a RWL which adds to that produced by the pulping process itself. However, given that the required comparison is one between the overall situation which confronts an individual operator and that which faces the industry as a whole, it is clear that the mere existence of "different" factors at a particular site do not give rise to the "fundamentally different factors" necessary to justify a variance. Petitioner's pulping and by-products operations must be considered together. Petitioner's total RWL, including the RWL from by-products production, is 170 pounds of BOD for each ton of production. In comparison, the average total RWL at the exemplary mills on which relevant BPT guidelines were based is 207 pounds of BOD for each ton of production. To allow petitioner to increase the BOD content of its raw waste load merely because it produces less RWL than other pulping operations would be contrary to the objectives of the Clean Water Act. This is particularly true in view of the fact that the reason for petitioner's relatively low raw waste levels is the existence of the by-products plant, which provides both the incentive and the means to recover the RWL from the pulping operation. Moreover, it is undisputed that the RWL from both the pulping and by-products operations is treated together at the same waste treatment facility. The processes are interrelated; they cannot be considered separately. It was appropriate for and incumbent upon EPA to consider the overall situation in making its determination that no fundamentally different factors existed.

Petitioner also contends that the EPA erred in preparing its Final Decision in that it compared Georgia-Pacific's raw waste load in 1978, after the Bellingham facility had already attained 1977 BPT effluent limitations, with an average raw waste load of other sulfite mills prior to attainment.

The thrust of petitioner's argument is that had EPA applied the proper data, it would have concluded that Georgia-Pacific does not produce a lower waste load than comparable mills. Petitioner's papers are, however, devoid of authority which would support its contention that the EPA comparison was the wrong one. Moreover, the 207 pound RWL guideline to which petitioner now takes exception is the same figure used by DOE in its variance determination, and by the EPA itself in preparing its Recommended Determination. At no time prior to filing this appeal did petitioner challenge the application of that figure. The attempt to do so at this late date is unsupported and unpersuasive.

■ Petitioner's final objection to EPA's Final Decision concerns the Weyerhaeuser-American Can complex in Wisconsin. Georgia-Pacific maintains that Wisconsin operation differs from the Bellingham facility only insofar as the former is owned by two separate corporations. It argues that a comparison of the two mills would require the issuance of the variance. To the contrary, a variance may not be based on a comparison between two individual facilities, but must be based on a comparison between the facility seeking the variance and the factors relied on by the agency in setting general BPT guidelines. *EPA v. National Crushed Stone Association*, 449 U.S. 64, 101 S.Ct. 295, 304, 66 L.Ed.2d 268 (1980); 40 C.F.R. § 430.212. Following this mandate the EPA properly deemed the Wisconsin mill to be irrelevant to the consideration of Georgia-Pacific's variance request. We find no abuse of discretion here.

The Final Decision of the Administrator of the Environmental Protection Agency which denied petitioner's variance request is, accordingly,

AFFIRMED.