AIR NORTH AMERICA; Richard Neumann, President of Air North America, Inc.; Ross R. Hart, Vice President of Air North America, Inc., Petitioners,

v.

DEPARTMENT OF TRANSPORTATION, Respondent.

No. 89–70245.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 3, 1990.

Decided July 2, 1991.

Ross R. Hart, and Richard D. Neumann, in pro se.

Thomas L. Ray, Sr. Trial Atty., U.S. Dept. of Transp., Washington, D.C., for respondent.

Before PREGERSON, REINHARDT and HALL, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Hart and Neumann, respectively the Vice President and President of Air North America, petition this court, pro se, for review of Department of Transportation ("the Department") orders revoking their airline's certificates of authority to provide air transportation.[1] We affirm the Department's orders.

I

Many years ago Congress established the rule that no one could operate as an air carrier until the Civil Aeronautics Board ("the Board") had issued a certificate of public convenience and necessity authorizing airline operations. Section 401(a) of the Federal Aviation Act of 1958 ("the Act"), 49 U.S.C.App. § 1371(a). Section 401(d) of the Act barred the Board from issuing a certificate unless the applicant demonstrated that it was fit, willing, and able to provide the proposed air transportation services, and to comply with the Act and any rules promulgated thereunder.

In recent years the regulatory environment in which airlines operate has undergone dramatic change. Prior to 1978, the airline industry was heavily regulated; the agency charged with carrying out this regulation was the Board. *See generally Civil Aeronautics Board v. Delta Airlines*, 367 U.S. 316, 81 S.Ct. 1611, 6 L.Ed.2d 869 (1961). The Board was responsible for, inter alia, setting both air routes and the rates that could be charged by the airlines that serviced these routes. *See id.* In 1978, Congress decided to substantially deregulate the airline industry. *See* The Air-

---

1. In the interest of brevity, Hart and Neumann will be referred to collectively as "AirNA."

line Deregulation Act of 1978 ("the Deregulation Act"), P.L. 95–504, 92 Stat. 1705 (1978). The Deregulation Act eliminated both the Board itself and many of its functions. *See* 49 U.S.C.App. § 1551. Most of the Board's remaining functions were transferred to the Department. *See id.*

When Congress deregulated the airline industry, it expanded the pre-existing fitness requirement embodied in section 401(a) of the Act. The Deregulation Act added a *continuing* fitness requirement applicable to all certificated carriers. 49 U.S.C.App. § 1371(r). Originally, the expanded fitness requirements were to end on December 31, 1984. Section 40 of Deregulation Act, 49 U.S.C.App. § 1551. However, before the Board's demise Congress chose to renew these fitness requirements and to transfer their administration to the Department. *See* Section 3(e) of the Civil Aeronautics Board Sunset Act of 1984, P.L. 98–443, 98 Stat. 1703, amending 49 U.S.C.App. § 1551.[2]

Upon succeeding the Board, the Department initially used the fitness rules that it inherited from the Board. These inherited rules prohibited a carrier that did not operate in the two years after initially being found fit from beginning operations until the carrier filed updated fitness data with the Board and the Board determined that the carrier remained fit. 14 C.F.R. 204.8 (1985 ed.). In adopting this requirement the Board had reasoned that if a carrier did not begin service for an extended period following a fitness determination, the carrier's operating plans might change dramatically during the dormant period. Thus, the Board concluded that a substantial dormant period left it with "no assurance that the applicant found fit is essentially the same applicant that begins service years later." 45 Fed.Reg. 73085, 73086 (November 4, 1980). However, under the Board's rules dormant certificates were allowed to remain outstanding, though they could not be used absent Board approval.

The Department discovered three major problems with the Board's approach to the dormancy problem. First, the Department believed that the dormant carriers' retention of their certificates "implies to the world that they ... continue[ ] to be found fit by the U.S. Government." 51 Fed.Reg. 19071, 19072 (May 26, 1986). Of more concern to the Department was its simple inability to effectively monitor the fitness of air carriers under the old system of dormant certificates. "[I]n a universe so full of dormant certificates, [the Department] simply cannot rely upon a system that leaves retention of a certificate solely to the discretion of a dormant carrier to advise us of developments affecting its certificate authority." 51 Fed.Reg. 40410, 40411 (Nov. 7, 1986). The agency believed its ability to monitor a carrier's fitness during its dormancy to be "seriously compromised," because "carriers tend to undergo substantial changes in management, financial resources, and even compliance disposition" and "often fail to comply with our insurance and reporting requirements." 51 Fed.Reg. 19071, 19072 (May 27, 1986). Moreover, a market in dormant certificates had sprung up. Persons hoping to avoid a fitness investigation would buy other carriers' dormant authority. 51 Fed.Reg. 19071, 19072 (May 27, 1986).

The Department concluded that certificate authority supported by stale fitness findings should cease to exist. In 1986, the Department amended the Board's fitness rules to provide that the certificates of carriers that have been dormant for more than one year will automatically be revoked. 51 Fed.Reg. 40410 (November 7, 1986). The certificate of Petitioners' airline, AirNA, was revoked pursuant to this regulation, 14 C.F.R. 2048.

AirNA was originally found fit to provide a variety of air transportation services by the Board in the years 1980–81. Orders 80–4–216 (April 29, 1980) and 80–6–27

---

**2.** The Federal Aviation Administration ("FAA"), a component of the Department, regulates airline safety and also issues an air carrier operating certificate. A carrier must have both the FAA certificate and the Department certificate before it may operate. *See* 49 U.S.C.App. § 1430(a)(4); 49 U.S.C.App. § 1371(r). The FAA and the Department consider different aspects of a carrier's fitness in their respective fitness reviews.

(April 29, 1980) (worldwide charter service); Order 81–10–57 (October 9, 1981) (domestic scheduled service). However, AirNA did not obtain the financing necessary for its proposed operations, did not apply for the required FAA certificate authority, and did not begin operations. Order 89–4–35 at 1, R. 25; Order 89–8–19 at 4.

During its dormancy AirNA twice had its fitness redetermined, first by the Board, Order 84–6–66 (June 21, 1984), and then by the Department, Orders 88–3–37 (March 15, 1988), and 88–3–68 (March 31, 1988). The Department order renewing AirNA's certificate authority stated that the authority would not take effect until the carrier obtained the necessary FAA authority and submitted certain current fitness information. Order 88–3–68 at 2. AirNA neither obtained the FAA authority nor submitted the additional information.

At the time that new rule 14 C.F.R. 204.8 was adopted, the Department issued a written notice to AirNA, informing AirNA of the regulation's terms. When AirNA remained dormant for over one year after the completion of the Department's last fitness review the Department revoked AirNA's certificates as provided in Rule 204.8. Order 89–4–35 (April 14, 1989), Order 89–4–58 (April 14, 1989). AirNA asked the Department to reconsider the orders revoking its authority. AirNA Pet. for Reconsideration. The Department denied reconsideration, finding that its procedures were fair and that there were no facts in dispute under Rule 204.8. Order 89–8–19 (August 11, 1989). In the course of denying reconsideration the Department rejected a number of AirNA's charges, among them charges that the automatic revocation system was anti-competitive and favored large carriers. These Orders are now under review. AirNA challenges the validity of the Department's Rule 204.8 in general, and the revocation of its certificates in particular.

## II

■ The Department argues that its decision to define section 1371 "fitness" in Rule 204.8 to exclude dormant carriers is a reasonable interpretation of the statute to which we should defer. We agree.

The key case is *Chevron U.S.A. v. Natural Resource Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Shortly after the Reagan Administration took office, the Environmental Protection Agency changed the definition of the term "source" in its rules so that a collection of pollution-emitting facilities in a particular geographic area could be considered as one "source." Previously, each pollution-emitting device in a plant had been considered a distinct "source" of pollution. As a result of the EPA's amendment of its rules, increased pollution from a new or modified facility could be compensated for by a decrease in pollution from a pre-existing facility. The court of appeals had rejected the EPA's definition of "source," noting that the new regime might not decrease pollution levels as quickly as the old. *National Resources Defense Council, Inc. v. Gorsuch,* 685 F.2d 718, 726 (D.C.Cir.1982). The *Chevron* Court faced the question whether the Court of Appeals properly overrode the EPA's definition of "source." The Court held that, since the EPA's definition of "source" was consistent with the statute's broad policies and Congress had not specifically resolved the issue, the EPA's definition could not be overridden. 467 U.S. at 843–44, 104 S.Ct. at 2781–82.

> In explaining its decision, the Court said: The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.... [I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.... A Court may not substitute its own construction ... for a reasonable interpretation made by the administrator.

467 U.S. at 843–44, 104 S.Ct. at 2782.

Thus, *Chevron*'s essential point is that when the language and policy of a statute permit a range of alternative approaches to

a particular problem, the courts must allow the agency charged with implementing the statute to choose the alternative that the agency prefers. For Congress, by sending its statute to the relevant agency for implementation, has delegated to that agency the function of choosing between implicit statutory options. The duty of the court in this circumstance is to keep the agency within the bounds of its delegated authority; the courts are to ensure that the agency does not go beyond the range of approaches that are consistent with the statute. Thus, the judicial role may often be, as one commentator has put it, to "specify what the statute cannot mean, and some of what it must mean, but not all that it does mean." Monaghan, Marbury and the Administrative State, 83 Colum.L.Rev. 1, 27 (1983).

The Ninth Circuit has of course respected the *Chevron* principal. In *Premex, Inc. v. Commodity Futures Trading Commission*, 785 F.2d 1403 (9th Cir.1986), we reviewed factual findings of an agency rather closely, and partially reversed the agency's imposition of sanctions on the grounds that the agency had failed to consider statutorily prescribed criteria. 785 F.2d at 1408–1409. However, we deferred to the agency's statutory interpretation to the extent that it did not conflict with the actual terms of the statute. 785 F.2d at 1406. *See also Lawrence v. Commodity Futures Trading Commission*, 759 F.2d 767 (9th Cir.1985); *Washington Dep't of Ecology v. EPA*, 752 F.2d 1465 (9th Cir.1985).

It appears that Congress has not resolved the specific question before us.[3] Thus, we must decide, keeping in mind Congress' silence on the meaning of the statutory concept of "fitness," whether the Department has defined the concept reasonably. The Department's interpretation

of "fitness" so as to exclude dormant carriers is certainly consistent with the policy of section 1371(r), the promotion of air safety. *See* U.S.Code & Admin.News Vol. 4, Sess. 2, 1978 at 3737, 3804. Rule 204.8 was promulgated only after a public rulemaking proceeding, and only after the Department specifically found that permitting dormant carriers to retain their certificates facilitated the purchase of dormant authority by carriers hoping to avoid a fitness investigation, hampered the ability of the Department to monitor the fitness of air carriers, and erroneously implied that the government continued to consider dormant carriers to be fit. *See* 51 Fed.Reg. 19071 (May 26, 1986). In light of Congress' silence, the policies of the statute, and the consequences associated with dormant certificates, the Department's conclusion that dormant air carriers should be considered unfit cannot be said to go beyond the range of reasonable interpretations of section 1371(r). Accordingly, we follow the standards set forth in *Chevron* and its Ninth Circuit progeny and accept the Department's interpretation.

■ The Department did not err in applying Rule 204.8 to AirNA. For there is no doubt that AirNA was dormant. AirNA claims that because it had an application for *scheduled international* service pending with the Department when its certificates for *scheduled domestic* service and *international charter* service were revoked, the Department erred in concluding that it was dormant.[4] We reject AirNA's argument. First, AirNA's application for an *international scheduled* service certificate seems to have little relevance to the question whether AirNA's certificates for *domestic scheduled* service and *international charter* service were dormant. Moreover, AirNA does not dispute that it has never applied for FAA certification, a

---

**3.** The statute at issue in the instant case does not specify how the Department is to determine whether an air carrier is "fit, willing, and able to perform properly the transportation covered by its application and to conform to the provisions of this chapter and the rules, regulations, and requirements of the [Department]." 49 U.S.C. § 1371(r). Nor does the legislative histo-

ry address the matter. *See* U.S.Code & Admin. News Vol. 4, Sess. 2, 1978 at 3804.

**4.** The parties agree that in July 1985, AirNa filed an application with the Civil Aeronautics Board for scheduled international authority. That application was transferred to the Department, which has yet to act on it.

prerequisite to a finding of non-dormancy. *See* Rule 204.8. Since AirNA failed to apply to the FAA for the requisite certifications within one year of being found fit by the Department, AirNA was dormant.

## III

Section 1371(r) provides that the Department may "modify, suspend, or revoke" the certificates of carriers that the Department finds unfit. 49 U.S.C.App. § 1371(r). The Department decided in Rule 204.8 to revoke the certificates of dormant carriers without prejudice. AirNA disputes this decision, contending that the Department should merely suspend the certificates of dormant air carriers.

■ AirNA's challenge to the Department's choice of remedy in Rule 204.8 fails. When a statute authorizes a number of alternative remedies, deference to the agency's selection is the only approach that is compatible with *Chevron.* For if the agency is to choose among *implied* statutory options through its rulemaking authority, then surely the agency must be allowed to choose among options *explicitly* left to its discretion. *See Chevron,* 467 U.S. at 843–44, 104 S.Ct. at 2781–82. Specifically, section 1371(r) provides that the Department may "modify, suspend, *or revoke*" the certificates of carriers that it finds "unfit." 49 U.S.C.App. § 1371(r) (emphasis added). The Department did not interpret this statute unreasonably when it found authority to revoke without prejudice the certificates of carriers that are "unfit" because they are dormant.[5] *See Chevron,* 467 U.S. at 843–44, 104 S.Ct. at 2781–82. Indeed, the Department decided to revoke dormant certificates only after conducting a rulemaking proceeding at which the Department made specific findings about the significant problems posed by allowing dormant carriers to retain their certificates. Thus, the Department's decision in Rule

204.8 to revoke dormant certificates was within the bounds of the discretion bestowed on the Department by section 1371(r).

■ AirNA also challenges Rule 204.8 as the rule was applied to its case. The Department's revocation of AirNA's certificate will be overturned only if unwarranted in law or unjustified in fact. *See Butz v. Glover Livestock Comm'n Co.,* 411 U.S. 182, 185–86, 93 S.Ct. 1455, 1457–58, 36 L.Ed.2d 142 (1973); *Moog Industries v. FTC,* 355 U.S. 411, 78 S.Ct. 377, 2 L.Ed.2d 370 (1958); *American Power Co. v. SEC,* 329 U.S. 90, 112, 118, 67 S.Ct. 133, 145, 148, 91 L.Ed. 103 (1946); *Bosma v. Department of Agriculture,* 754 F.2d 804, 810 (9th Cir. 1984). Revocation of AirNA's certificate was not unwarranted in law; we have already held that Rule 204.8 is a reasonable interpretation of section 1371(r) under *Chevron.* Moreover, revocation of AirNA's certificate was not unsupported in fact. Section 1371(r) provides that the certificates of "unfit" carriers may be revoked. Rule 204.8 validly interprets "lack of fitness" to include dormancy. AirNA was dormant. Thus, AirNA's dormancy made the airline "unfit" and provided the necessary factual precondition to revocation.

## IV

■ AirNA argues that, even if the substantive measures taken by the Department were within the Department's statutory mandate, the procedures used by the Department in revoking AirNA's certificate were inappropriate. Specifically, AirNA argues that the Department failed to provide it with notice and a hearing, as the language of § 1371(r) requires, before revoking its certificate. We conclude that the Department did satisfy the procedural requirements of § 1371(r).[6] This conclusion follows from the general principle that

5. The implications of the fact that the revocations are accomplished without prior fact-seeking hearings are discussed below in sections IV and V.

6. The words "notice and hearing," used in the conjunctive as they are in § 1371(r), may indi-

cate the intention that a full adjudicatory-style proceeding be undertaken. *See* 49 U.S.C.App. § 1371(r); 5 U.S.C. §§ 556, 557. We do not decide this question, since in the instant case no fact-seeking hearing of any type was required under applicable precedent.

an agency need not conduct a factual hearing if there are no factual questions to resolve. *See Georgia–Pacific Corp. v. EPA,* 671 F.2d 1235 (9th Cir.1982); *Treasure Valley CATV Comm'n v. United States,* 562 F.2d 1182, 1187 (9th Cir.1977).

In the instant case, the Department eliminated through its rules factual questions that might otherwise have been resolved through a hearing. The fountainhead case on the interaction of agency rulemaking and statutory hearing provisions is *United States v. Storer Broadcasting Co.,* 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956). The FCC, in executing its power to grant broadcast licenses in the public interest, promulgated a rule saying that station owners could own only five television stations. If a station owner owned more than five, the FCC would refuse to grant it licenses for additional stations. The Communications Act of 1934, from which the FCC derived its licensing authority, required the agency to give applicants a "full hearing." The FCC had instead allowed no more than written responses by those seeking a waiver of its rules. 351 U.S. at 201, 76 S.Ct. at 769.

The question before the *Storer* Court was whether the FCC, by establishing rules that defined conduct not in the public interest, could eliminate the use of wide-ranging factual hearings to decide whether a particular applicant's conduct was in the public interest. The Court decided that the FCC did have this power, saying that the hearing provisions of the Act did not withdraw "from the power of the Commission the rule-making authority necessary for the orderly conduct of its business." 351 U.S. at 202, 76 S.Ct. at 770. *See also Costle v. Pacific Legal Found.,* 445 U.S. 198, 100 S.Ct. 1095, 63 L.Ed.2d 329 (1980) (applying *Storer* to uphold the elimination of a hearing); *Weinberger v. Hynson, Westcott & Dunning,* 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973) (same).

The Ninth Circuit has long followed the lead of *Storer. In Total Telecable v. FCC,* 411 F.2d 639 (9th Cir.1969) a community antennae operator objected to the FCC's nonduplication rule, which had caused the FCC to order the operator to discontinue some of his operations. The operator argued that the failure of the FCC to provide a hearing before issuing its order violated pertinent statutes. The court held, in accord with *Storer,* that an agency that promulgates a valid rule of general application may deny fact-seeking hearings to those who facially violate the agency's rules. However, the *Total Telecable* court added that it was important for the agency to provide affected persons the opportunity to demonstrate any special reasons that the agency's rule should not be applied to their individual case. *Id.* at 643. *See also Washington Util. & Transp. Comm'n v. FCC,* 513 F.2d 1142 (9th Cir.) (holding that when dealing with a matter of general application the FCC may determine that adjudicatory hearings are not in the public interest, do away with them, and substitute rules that eliminate most factual questions), *cert. denied sub nom. National Ass'n of Regulatory Util. Comm'rs v. FCC,* 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975).

Under *Storer* and its Ninth Circuit progeny the Department's decision not to conduct a hearing before revoking the licenses of dormant carriers was not an error. The agency adopted a specific rule, dormancy, to fill in some of the terrain covered by the broad statutory concept "lack of fitness." As a result, the wide-ranging factual hearing that might otherwise have been needed to do justice to the statute became superfluous.

AirNA charges that the Department did not provide an adequate opportunity before its certificate was revoked to demonstrate the existence of special factors in its individual case that made the application of Rule 204.8 inappropriate, as required by *Storer* and *Total Telecable.* However, AirNa has never shown that any such "special factors" exist. AirNA has made general, unsupported charges of "blacklisting" and favoritism towards large carriers. However, these allegations do not establish the existence of "special factors" within the meaning of *Storer* and *Total Telecable.* According to AirNA, blacklisting affects all individuals whose certificates are revoked.

It therefore does not constitute a "special factor." The allegations of favoritism towards large carriers related to "witch hunts against unsuspecting new entrants who ... learned to their dismay that they were alleged to be old [Board] violators in matters taking place decades earlier" and not to the application of the dormancy rules. This allegation also does not constitute a "special factor." If there was a violation of *Storer* and *Total Telecable,* that violation would constitute harmless error in this case. Thus, we need not consider whether the procedures followed by the Department failed to give AirNA an adequate opportunity to demonstrate the existence of "special factors."

We must address the decision of a sister circuit that has declined to follow *Storer* in a setting essentially identical to that of the instant case. In *Oceanair of Florida v. U.S. Dept. of Transportation,* 876 F.2d 1560 (11th Cir.1989), the Department of Transportation revoked an air carrier's certificate of public convenience and necessity pursuant to Rule 204.8, and the carrier appealed. The Eleventh Circuit held that the Department's failure to conduct a fact-seeking hearing before revoking the carrier's certificate rendered the Rule 204.8 revocation invalid under section 1371(r). *See* 876 F.2d at 1565–1566.

There are three discernible reasons for the *Oceanair* court's decision. First, the *Oceanair* court was highly impressed with the "notice and hearing" language of § 1371(r). However, under *Storer* this language is far from determinative, since the statute in *Storer* itself required a "full hearing." *Storer,* 351 U.S. at 195–96 n. 5, 76 S.Ct. at 766 n. 5. Second, the *Oceanair* court erroneously believed that a factual question remained to be resolved, despite Rule 204.8's "bright line." Specifically, the *Oceanair* court believed that, "Because § [1371](r) provides for the modification, suspension, *or* revocation of a certificate for unfitness, the mere inability to operate does not render revocation of a carrier's certificate a foregone conclusion." *Oceanair,* 876 F.2d at 1566 n. 10. This statement is simply wrong insofar as it suggests that Rule 204.8 leaves the appropriate remedy

for dormancy to be resolved as a factual question in individual cases. Rule 204.8 is quite clear that revocation is the automatic, invariable, remedy. Moreover, we are not at liberty to override the Department's choice of revocation instead of its other statutory options. *See* Part III, *supra.*

Finally, the *Oceanair* court quotes at length from *Civil Aeronautics Board v. Delta Airlines,* 367 U.S. 316, 81 S.Ct. 1611, 6 L.Ed.2d 869 (1961). The *Oceanair* court's reliance on *Delta Airlines* is understandable, since *Delta Airlines* is a startlingly close case factually. In *Delta Airlines* the Supreme Court rejected the Civil Aeronautics Board's claim that it need not provide a hearing before revoking Delta's certificate of convenience and necessity, even though the Board had noted in its order originally granting Delta's certificate that it might modify the certificate after the certificate's effective date. 367 U.S. 316, 81 S.Ct. 1611, 6 L.Ed.2d 869.

However, despite the view of the *Oceanair* court, and *Delta Airlines'* patina of factual similarity, *Delta Airlines* does not control the instant case. In *Delta Airlines* the Board had not issued a general rule that affected everyone, but had instead issued an order specifically directed towards Delta that was based on consideration of Delta's individual circumstances. The different setting of *Delta Airlines* has two important consequences. First, the highly fact specific agency action in *Delta Airlines* meant that the core concern of *Storer* was not implicated. For *Storer*'s concern is that agencies not be prevented from efficiently carrying out their business by adopting rules that specifically define acceptable conduct and that thereby eliminate the need for wide-ranging factual hearings. *See Storer,* 351 U.S. at 202, 76 S.Ct. at 770. Since in *Delta Airlines* there was no question of general rulemaking, there was no reason in that case to follow *Storer.* In contrast, when an agency's general rulemaking power may be constrained by a hearing requirement, as in *Oceanair* and the instant case, there is every reason to follow *Storer.* Moreover, *Delta Airlines* was not a case in which a valid administra-

tive rule eliminated factual questions and thereby rendered a fact-seeking hearing superfluous. Rather, *Delta Airlines* involved a prudential agency decision, route allocation, that was necessarily based on myriad factors. As such, in *Delta Airlines*, unlike the instant case, the hearing required by the Court was essential to ensure that all facts were presented to the Board. *See* 367 U.S. at 331, 81 S.Ct. at 1622.[7]

We reject the approach of *Oceanair*, with its misplaced reliance on *Delta Airlines*, and follow *Storer*. We accordingly conclude that in the instant case the Department had no obligation to conduct a fact-seeking hearing, notwithstanding the language of section 1371(r).

### V

Even though the Department's revocation of AirNA's certificate complied with section 1371(r), the revocation is nevertheless invalid if the Department failed to comply with the requirements of the Administrative Procedure Act ("APA"). *See W.C. v. Bowen*, 807 F.2d 1502, 1504 (9th Cir.), *amended*, 819 F.2d 237 (1987).

The relevant provision of the Administrative Procedure Act provides:

> Except in cases of willfulness or those in which public health, interest, or safety requires otherwise, the withdrawal, suspension, revocation, or annulment of a license is lawful only if, before the insti-

tution of agency proceedings therefor, the licensee has been given—

> (1) notice by the agency in writing of the facts or conduct which may warrant the action; and

> (2) opportunity to demonstrate or achieve compliance with all lawful requirements.

5 U.S.C. § 558(c).

■ A threshold question is whether the certificate issued by the Department to AirNA constitutes a "license" within the meaning of section 558(c); the Department argues that its certificate is not a license. Since the Department is not at present interpreting the statute that it is charged with implementing, *Chevron* deference is inappropriate. *See Adams Fruit Co. v. Barrett*, 494 U.S. 638, 110 S.Ct. 1384, 1390–91, 108 L.Ed.2d 585 (1990) (a precondition to *Chevron* deference is a congressional delegation of administrative authority); *Crandon v. United States*, 494 U.S. 152, 110 S.Ct. 997, 1011, 108 L.Ed.2d 132 (1990) (Scalia, J., concurring in the judgment). Since Congress has not directed the Department to implement the APA, it does not appear that Congress has implicitly directed that the Department choose among the range of alternative statutory approaches. And it is this implicit directive that makes *Chevron* deference appropriate. *See id.;* Sunstein, Law and Administration After Chevron, 90 Colum.L.Rev. 2071, 2093–94 (1990). Moreover, ambiguities in the APA are not properly viewed as Congressional delegations to the administrative

---

7. It is also worth noting that *Delta Airlines* is not based on 49 U.S.C.App. § 1371(r), as are *Oceanair* and the instant case. Instead, the *Delta Airlines* Court was concerned with an agency order predicated on section 1371(e), which relates to route allocation. Section 1371(e) dates from the original Civil Aeronautics Act of 1938. Section 1371(e) was thus enacted as part of a system, since eliminated by deregulation, that gave the old Civil Aeronautics Board broad power to set rates and routes. *See generally, Delta Airlines*, 367 U.S. at 316, 81 S.Ct. at 1614. The fact that the agency action in *Delta Airlines* was based on § 1371(e) rather than § 1371(r) is relevant, since the *Delta Airlines* Court was very concerned with the need to give air carriers "security of route." The Court believed that Congress in enacting section 1371(g), which prescribed procedures for revoking certificates granted under § 1371(r), intended to provide carriers with procedural assurances that the Board would not first grant a route to an airline, then jerk the route out from under the airline after the airline had invested in equipment to service it. 367 U.S. at 324, 81 S.Ct. at 1618. Uncertainty as to route allocations, the Court feared, would impede investment in air transportation. *Id.* The highly discretionary authority and the degree to which the old Board was enmeshed in the air transportation industry made the procedural protections afforded to those affected by the Board's power tremendously important. Of course, we express no view as to the continuing validity of *Delta Airlines* in § 1371(g) cases. Nor do we intimate that we would not follow *Delta Airlines* were *Storer* not applicable.

agencies, since the very purpose of the APA is to constrain these agencies. *See Wong Yang Sung v. McGrath*, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950). Thus, despite *Chevron*, this court has declined to defer to agency constructions of the APA. *See W.C. v. Bowen*, 807 F.2d at 1504 (holding agency action in violation of the APA void, but not addressing *Chevron*); *Go Leasing, Inc. v. National Transportation Safety Board*, 800 F.2d 1514, 1522 (9th Cir.1986) (appearing to evaluate the agency's construction without deference). *See also Air Transport Ass'n of America v. Dept. of Transp.*, 900 F.2d 369, 372 (D.C. Cir.1990) (invalidating an agency's rulemaking procedures under the APA), *vacated on other grounds*, — U.S. —, 111 S.Ct. 944, 112 L.Ed.2d 1033 (1991); *American Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1054 (D.C.Cir.1987) (rejecting a proposed agency interpretation); *id.* at 1058 (Mikva, J., concurring and dissenting).

 Upon our independent analysis of section 558(c), we conclude that AirNA's certificate was a "license." First, the definition of license in the APA is extremely broad. The relevant section says that a license "includes the *whole or a part* of any agency permit, *certificate*, approval, registration, charter, membership, statutory exemption or other form of permission." 5 U.S.C. § 551(8) (emphasis added). The Department's certificate, if not in itself sufficient to allow AirNA to fly, fell within this broad language. Second, other courts that have addressed the scope of the APA's definition of "license" have read section 551(8) broadly, in accord with its terms. *See, e.g., Atlantic Richfield Co. v. United States*, 774 F.2d 1193, 1200 (D.C.Cir.1985).[8]

 We turn to the question whether the Department complied with section 558(c) by giving AirNA adequate notice and adequate opportunity to correct its shortcomings. First, we must decide whether the notice given AirNA was sufficient for section 558(c) purposes. The parties agree that AirNA was given notice of Rule 204.8's requirements at the time that the rule became effective, eighteen months before AirNA's license was revoked. The statute does not explain what constitutes adequate notice. *See* 5 U.S.C. §§ 558(c), 551.[9] The

8. The Department also argues that, even if AirNA's certificate is a section 558(c) license, the revocation of AirNA's certificate was exempt from section 558(c). Specifically, the Department claims that, since it decided automatic revocation was in the public interest, its revocation of AirNA's certificate fits within section 558(c)'s "public interest" exception. Section 558(c) exempts revocations required by the "public health, interest, or safety" from its provisions on notice and opportunity to correct. 5 U.S.C. § 558(c).

The Department's proposed interpretation would render section 558(c) nonsensical. The Department would limit section 558(c) to cases in which the agency revoked a license though it did not believe the revocation to be in the public interest. Yet every agency action is taken because the agency believes the action to be in the public interest, at least in theory. Thus, to read section 558(c) as the Department proposes would nullify every word of that section except the "public interest" exception, and the "public interest" clause would swallow the section. A number of courts have had occasion to address the meaning of exception clauses like that in section 558(c). Not surprisingly, these courts have uniformly concluded that such exceptions are directed to unusual, emergency, situations. *See Air East, Inc. v. National Transportation Safety Board*, 512 F.2d 1227 (3d Cir.), *cert. denied*, 423 U.S. 863, 96 S.Ct. 122, 46 L.Ed.2d 92

(1975); *Nader v. FAA*, 440 F.2d 292 (D.C.Cir. 1971); *New England Air Express v. CAB*, 194 F.2d 894 (D.C.Cir.1952). *Cf. United States v. Vertol H21C*, 545 F.2d 648 (9th Cir.1976) (considering Fifth Amendment due process). It is apparent that there was no such emergency in this case. As such, section 558(c)'s "public interest" exception is inapplicable.

9. There is at present a split among the circuits as to whether section 558(c)'s requirements of notice and opportunity to correct create an obligation that the agency conduct a full adjudicatory hearing. *See New York Pathological & X-Ray Labs, Inc. v. INS*, 523 F.2d 79, 82 (2d Cir. 1975) (holding that a full adjudicatory hearing is required under § 558(c)); *Gallagher & Ascher Co. v. Simon*, 687 F.2d 1067, 1074–76 (7th Cir. 1982) (holding that section 558(c) does not require a full adjudicatory hearing). We do not reach this question. We have already decided that *Storer* eliminates the need for an adjudicatory factual hearing under section 1371(r), since the Department's rules have eliminated the need to resolve factual issues. The same reasoning would eliminate the need for an adjudicatory factual hearing under section 558(c) if one were required. *See Atlantic Richfield Co. v. United States*, 774 F.2d 1193 (D.C.Cir.1985) (holding that no adjudicatory section 558(c) hearing is required when there are no factual issues in dispute).

legislative history also seems barren. *See* H.Rep. 79–1980, 79th Cong., 2d Sess. (1946). However, some guidance is provided by the general policies that underlie section 558(c). "Congress enacted section 9(b) [§ 558(c)] to afford licensees 'an opportunity to comply with the requirements' of a license before termination." *Atlantic Richfield,* 774 F.2d at 1200 (quoting Attorney General's Manual on the Administrative Procedure Act 91 (1947)); *see also Gallagher & Ascher Co. v. Simon,* 687 F.2d 1067 (7th Cir.1982). This policy suggests that the key consideration is whether the written notice of a regulation's requirements is sufficient to allow the licensee an opportunity to comply with the regulation.

There is also some guidance to be gleaned from the case law of the Ninth Circuit. In *Lawrence v. Commodities Futures Trading Commission,* 759 F.2d 767 (9th Cir.1985) we noted that the purpose of section 558(c) is to provide individuals with an opportunity to correct their transgressions before the termination or suspension of their licenses. We held that the requirements of section 558(c) had been fulfilled because the petitioners had been provided the requisite "second chance." *See also Great Lakes Airlines, Inc. v. CAB,* 291 F.2d 354 (9th Cir.1961) (holding the Board's action against a carrier acceptable, since the carrier was aware of the parameters of permissible conduct and there was no unfair surprise).

■ Both the policies underlying section 558(c) and Ninth Circuit authority suggest that notice is sufficient if the notice warns the licensee of the parameters of acceptable conduct and thereby prevents unfair surprise. Since written notice of Rule 204.8's requirements was given to AirNA eighteen months before that rule was applied to AirNA, AirNA cannot persuasively claim unfair surprise. If AirNA was unaware of Rule 204.8, this lack of awareness was not the fault of the Department. However, we pause to highlight that notification issued upon the adoption of a regulation will not in all cases be sufficient; a claim of unfair surprise may carry significant weight if no notice of a

rule's requirements has been given for many years. *See Hutto Stockyard, Inc. v. United States Dep't of Agric.,* 903 F.2d 299, 304 (4th Cir.1990) (notice given a decade before insufficient). In short, the sufficiency of notice is a fact-specific inquiry. Though we find that the notice given to AirNA was sufficient, we do not suggest that notification given upon the adoption of a regulation will in all cases be enough.

■ In addition to notice of the conduct that may result in a license revocation, section 558(c) requires that a licensee be provided an opportunity to comply with the relevant rules, or an opportunity to demonstrate compliance. Since AirNA was afforded written notice of the threat posed to its certificate eighteen months before the certificate was revoked, AirNA had sufficient opportunity to bring itself into compliance with Rule 204.8. *See Gallagher & Ascher Co.,* 687 F.2d at 1075–76; *see also* Order 89–8–19 at 4 (when a dormant carrier is actively attempting to become operational and is likely to be able to begin operations in the near future, the Department may exempt the carrier from revocation under 49 U.S.C.App. § 1386(b)).

## VI

■ AirNA argues that it was denied procedural due process by the Department's revocation procedures. However, the due process clause does not require a hearing when, as in this case, there are no factual questions to resolve. *See Atlantic Richfield,* 774 F.2d at 1203; *McCachren v. United States Dep't of Agric.,* 599 F.2d 655, 656–57 (5th Cir.1979). *See also Costle v. Pacific Legal Found.,* 445 U.S. 198, 100 S.Ct. 1095, 63 L.Ed.2d 329 (1980) (not specifically addressing the Fifth Amendment issue, but finding agency procedures that denied a hearing on the grounds that there was no factual dispute sufficient under *Storer* ); *Weinberger v. Hynson, Westcott & Dunning,* 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973) (same); *Georgia–Pacific Corp. v. EPA,* 671 F.2d 1235 (9th Cir. 1982) (same).

The Orders of the Department are AF-FIRMED.